**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 19-10377

United States Court of Appeals
Fifth Circuit

**FILED**

December 30, 2019

Lyle W. Cayce
Clerk

THE INCLUSIVE COMMUNITIES PROJECT, INCORPORATED,

Plaintiff–Appellant,

versus

DEPARTMENT OF TREASURY;
OFFICE OF THE COMPTROLLER OF THE CURRENCY,

Defendants–Appellees.

Appeal from the United States District Court
for the Northern District of Texas

Before JOLLY, SMITH, and COSTA, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

The Inclusive Communities Project, Inc. ("ICP"), sued the Department of the Treasury ("Treasury") and the Office of the Comptroller of the Currency ("OCC"), asserting, *inter alia*, claims under Section 3608 of the Fair Housing Act ("FHA") and the Fifth Amendment. ICP averred that Treasury and OCC had failed to regulate the federal Low-Income Housing Tax Credit ("LIHTC") program so as to promote fair housing. The district court granted summary

No. 19-10377

judgment to OCC and Treasury on three grounds:  (1) ICP lacked Article III standing to sue OCC; (2) the court couldn't review ICP's FHA claim because ICP hadn't challenged any "final agency action" under the Administrative Procedure Act ("APA"); and (3) ICP's Fifth Amendment claim failed on the merits.  Because ICP lacks standing to sue either OCC or Treasury, we affirm in part, vacate in part, and render a judgment of dismissal.

I.

The Tax Reform Act of 1986 established the LIHTC program to encourage the development of affordable rental housing.  Pub. L. No. 99–514, § 252, 100 Stat 2085, 2189–208 (codified at 26 U.S.C. § 42).   The statute provides tax subsidies for "qualified low-income housing project[s]."   26 U.S.C. § 42(g)(1). The credits are first apportioned by Congress, based on population, to state and local Housing Credit Agencies ("HCAs"), *id*. § 42(h)(3), which then allocate the credits to sponsors of and investors in affordable housing projects, *see id*. § 42(m).

Each HCA is required to enact a Qualified Allocation Plan ("QAP") establishing the body's priorities for allocating the credits. *Id*. § 42(m)(1)(B).  Each QAP must set forth selection criteria, give preference to projects benefiting people most in need of affordable housing, and provide a procedure for the HCA to monitor noncompliance by project sponsors. *Id*.  HCAs also may add criteria that "are appropriate to local conditions." *Id*. § 42(m)(1)(B)(i).  And HCAs can deviate from those criteria if they offer a publicly available written explanation. *Id*. § 42(m)(1)(A)(iv).

The Texas Department of Housing and Community Affairs ("TDHCA") has adopted a comprehensive scoring rubric to determine which affordable housing projects will receive LIHTCs.  *See generally* 10 TEX. ADMIN. CODE § 11.9.   The scoring criteria reduce to four basic categories: (1) "[c]riteria

2

No. 19-10377

promoting development of high quality housing," (2) "[c]riteria to serve and support Texans most in need," (3) "[c]riteria promoting community support and engagement," and (4) "[c]riteria promoting the efficient use of limited resources and applicant accountability." *Id*. § 11.9(b)–(e). Significant points are available in all four categories, though the most are potentially available in categories (2) and (3).[1] Generally, applications with the highest combined score are given the highest priority for LIHTC assignment. *See id*. § 11.6(3).

At the federal level, the LIHTC program is administered by Treasury, which has the authority to "prescribe such regulations as may be necessary or appropriate." 26 U.S.C. § 42(n). Treasury also has the power to deny or recapture a LIHTC claimed by a noncompliant investor. *Id*. § 42(j). It is likewise empowered to issue revenue rulings, publish guidance, and issue notices regarding all provisions of the Tax Code, including those governing LIHTCs. *See id*. § 7805(a); 26 C.F.R. § 601.601(d). Only HCAs, however, have the power to choose what projects will receive LIHTCs. *See* 26 U.S.C. § 42(m).

OCC, an independent bureau within Treasury, is the primary regulator of "national banks" and "federal savings associations." *See* 12 U.S.C. § 1 *et seq*. National banks generally are forbidden from owning or investing in real property, but they can make public welfare investments ("PWI") in real estate, including LIHTC projects, that don't expose them to unlimited liability.[2] As part of its role, OCC regulates and approves national banks' PWIs. *See* 12 C.F.R. pt. 24. But OCC doesn't regulate all individuals or entities that may

---

[1] Applications also may receive a 30% boost in "Eligible Basis"—the tax basis against which the credit is applied—if the proposed project meets certain criteria. *See* 10 TEX. ADMIN. CODE § 11.4(c). And in addition to the scoring metrics, TDHCA also considers, among other things, the concentration of the LIHTC projects it approves. *See id*. § 11.3.

[2] 12 U.S.C. § 24 (Eleventh); *see also* 64 Fed. Reg. 70986, 70988 (Dec. 20, 1999) (recognizing that LIHTC projects may be PWIs).

No. 19-10377

invest in LIHTC projects, and it isn't involved in selecting which projects receive LIHTCs.

ICP "is a fair housing focused nonprofit organization working with families seeking access to housing in predominately nonminority areas of the Dallas metropolitan area." ICP uses its resources to encourage the development of LIHTC projects in non-minority-concentrated areas, and it assists minority families who participate in the Dallas Housing Authority's Section 8 Housing Choice Voucher program. Because LIHTC units can't refuse to rent to tenants using Section 8 vouchers,[3] it's important to ICP where those projects are located within the Dallas metropolitan area. ICP can help its clients obtain LIHTC units more efficiently—*i.e.*, using less time and money—than other housing options.

## II.

ICP has been involved in litigation related to the LIHTC program for more than a decade. In 2008, ICP brought a FHA claim against TDHCA, alleging that TDHCA perpetuated racial segregation by disproportionately allocating LIHTCs to projects in non-white neighborhoods.[4] That case, which included a bench trial and review in this court and the Supreme Court, was ultimately dismissed in 2016.[5]

ICP filed this suit in 2014, asserting, *inter alia*, claims under Section

---

[3] *See* 26 U.S.C. § 42(h)(6)(B) (requiring an "extended low-income housing commitment," which prohibits credit holders from refusing to rent to tenants using a Section 8 housing voucher); 26 C.F.R. § 1.42-5(c)(1)(xi) (requiring annual certification of compliance with § 42(h)(6)(B)(iv)).

[4] *See Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, No. 3:08-CV-0546-D, 2008 WL 5191935, at *1 (N.D. Tex. Dec. 11, 2008).

[5] *See Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, No. 3:08-CV-0546-D, 2016 WL 4494322, at *1 (N.D. Tex. Aug. 26, 2016).

3608 of the FHA and the Fifth Amendment.[6]  Specifically, ICP averred that Treasury and OCC have abdicated their Section 3608 duties to regulate the LIHTC program in a manner that furthers fair housing.  That abandonment, ICP suggested, was also intentional discrimination in violation of the Fifth Amendment.  ICP sought injunctive relief, attorney's fees, and costs.

ICP's claim is based primarily on statistical data showing that LIHTC housing in Dallas remains segregated by race.  As of 2017, 96% of both LIHTC projects (161 of 168) and LIHTC units (27,823 of 28,874) were located in minority-concentrated areas (less than 50% white, non-Hispanic).  Between 1995 and 2017, 96 of the 101 approved LIHTC projects in Dallas were built in minority-concentrated areas.  Moreover, 57 of them were owned by national banks, and only one of these bank-owned projects was sited in a minority-concentrated area.  Black voucher families often suffered the effects most acutely, and ICP alleged that the current racial segregation in Dallas public housing was equivalent to the conditions under city-sanctioned *de jure* segregation but with more than three times as many units.

Treasury and OCC moved for summary judgment on three grounds:  ICP (1) lacked Article III standing; (2) hadn't challenged any final agency action under the APA, a jurisdictional prerequisite for its Section 3608 claim; and (3) hadn't made a *prima facie* case of intentional discrimination under the Fifth Amendment.  ICP moved for partial summary judgment on standing and its Section 3608 claim.

The district court granted Treasury and OCC's motion and denied ICP's.  The court ruled that ICP didn't have standing to pursue its claims against OCC

---

[6] ICP also raised claims under Section 3604 of the FHA and 42 U.S.C. § 1982, but it doesn't press them on appeal.

No. 19-10377

because it hadn't established that its alleged injury was traceable to OCC's conduct or that the relief it requested would redress that injury. The court found that ICP had standing to sue Treasury, but it still rejected the claims against it. The court held that it lacked jurisdiction to consider the Section 3608 claim because ICP hadn't identified any final agency action under Section 702 of the APA. And as for the Fifth Amendment claim, the court determined that ICP had failed to adduce "any evidence that would support the reasonable finding that Treasury failed to act, or delayed in acting, because it intended to discriminate on the basis of race." ICP appealed. We review summary judgments and questions of standing *de novo*. *See Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 343 (5th Cir. 2013).

### III.

### A.

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). To have standing, ICP "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[7] "Th[at] triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement," and ICP, as "the party invoking federal jurisdiction[,] bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998) (footnote omitted).

---

[7] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). *Accord Texas v. United States*, No. 19-10011, 2019 U.S. App. LEXIS 37567, at *25 (5th Cir. Dec. 18, 2019).

No. 19-10377

"[E]ach element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, with the same evidentiary requirements of that stage of litigation." *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 366 (5th Cir.), *as revised* (Feb. 1, 2018), *cert. denied*, 139 S. Ct. 211 (2018) (quotation marks omitted).  Thus, at summary judgment, ICP can't rely on "mere allegations"; it "must set forth by affidavit or other evidence specific facts" supporting standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quotation marks omitted).

B.

Even though Article III requires a causal connection between the plaintiff's injury and the defendant's challenged conduct, it doesn't require a showing of proximate cause or that "the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169 (1997).  Causation, for example, isn't precluded where the defendant's actions produce a "determinative or coercive effect upon the action of someone else," resulting in injury.  *Id.*  But ICP's injuries can't be "the result of the independent action of some third party not before the court."  *Id.* at 167.  Nor can they be "self-inflicted." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999).

To satisfy redressability, a plaintiff must show that "it is *likely,* as opposed to merely *speculative*, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (emphasis added).  The relief sought needn't completely cure the injury, however; it's enough if the desired relief would lessen it.  *See Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014).  But "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co.*, 523 U.S. at 107.

No. 19-10377

Those standards make it difficult for a plaintiff to establish standing to challenge a government action if he isn't its direct object:

> When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, . . . and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.

*Defs. of Wildlife*, 504 U.S. at 562 (quotation marks and citations omitted). We confront that situation here: Neither Treasury nor OCC regulates ICP.

IV.

Nevertheless, ICP avers that it has standing to press its claims against both Treasury and OCC. But the evidence on which it relies reveals that the lines of causation between Treasury and OCC's conduct and ICP's injuries are hazy at best. Consequently, ICP can't establish causation or redressability against either Treasury or OCC.[8]

ICP's alleges three injuries, all of which involve expending greater resources to help place minority families in acceptable housing units located in non-minority-concentrated areas.[9] First, ICP contends that the lack of LIHTC units in non-minority-concentrated areas causes it to incur between $350 and

---

[8] We therefore express no opinion on the other issues ICP raises on appeal.

[9] Because the standing test is conjunctive, we assume, without deciding, that ICP has satisfied Article III's injury-in-fact requirement. *See Williams v. Parker*, 843 F.3d 617, 621 (5th Cir. 2016) ("If the party invoking federal jurisdiction fails to establish any one of injury in fact, causation, or redressability, then federal courts cannot hear the suit.").

No. 19-10377

$950 in additional operating costs to place each client. Second, ICP complains that Treasury's refusal to forbid TDHCA from applying "local veto selection criteria" prevents LIHTC projects in non-minority-concentrated areas from ever being built. That, in turn, renders ICP's payments to developers to encourage building LIHTC projects in those areas "sunk costs." And third, ICP maintains that Treasury's failure to enforce a certain Tax Code provision, which requires LIHTC projects sited in "qualified census tracts"[10] to be part of a "concerted community revitalization plan," causes ICP to incur additional costs.

## A.

All three injuries ICP alleges apply to Treasury, and all boil down to essentially the same theory of causation. ICP contends that its injuries are traceable to Treasury's actions because Treasury has plenary authority over the LIHTC program, including the power both to issue regulations and to recapture LIHTCs from investors who violate the FHA. To bolster its position, ICP attempts to show that Treasury regulations can coerce parties it doesn't directly regulate by analogizing to Treasury's regulation of tax credits for private schools that discriminate based on race.

## 1.

ICP fails to appreciate Congress's allocation of administrative responsibilities for the LIHTC program. Although Congress gave Treasury the power to regulate the program, *see* 26 U.S.C. § 42(n), it gave state and local HCAs the power to allocate the credits to specific affordable housing projects, *see*

_____

[10] "The term 'qualified census tract' means any census tract which . . . for the most recent year for which census data are available on household income in such tract, either in which 50 percent or more of the households have an income which is less than 60 percent of the area median gross income for such year or which has a poverty rate of at least 25 percent." 26 U.S.C. § 42(d)(5)(B)(ii)(I).

*id.* § 42(h).  Consequently, ICP's theory of causation necessarily invokes two levels of coercion: (1) Treasury's coercion of TDHCA and (2) TDHCA's coercion of project sponsors.  ICP therefore must establish a causal chain with at least two links—one that connects the actions ICP proposes that Treasury take to some corresponding change in how TDHCA allocates LIHTCs, and another connecting that change to the financial injuries that ICP suffers, which are caused by the location of LIHTC units.  ICP establishes neither.

Even if Treasury regulated TDHCA in the manner that ICP wants (*e.g.*, by issuing a regulation requiring TDHCA to allocate credits to affirmatively further fair housing, or something like that[11]), it isn't at all clear how TDHCA would respond.  That's unsurprising, because TDHCA's QAP is a comprehensive rubric with many factors.  Certainly, community support can bolster an application.[12]  But substantial points are available in other criteria that Treasury's alleged failure to regulate doesn't affect.  *See* 10 TEX. ADMIN. CODE § 11.9(b)–(c), (e).  And it's unclear that TDHCA, which has broad latitude to allocate LIHTCs in any manner "appropriate to local conditions,"[13] would maintain the same scoring formula even if Treasury started regulating in the manner that ICP wishes.

Moreover, even assuming that TDHCA would alter its scoring formula to account for ICP's concerns (*e.g.*, by eliminating the "local veto" criteria)—a speculative inference in itself—it's entirely speculative that such would result in LIHTCs' being allocated to projects in locations that ICP favors.  TDHCA doesn't commission projects or determine where they should be sited.  Private

---

[11] At oral argument, counsel for ICP was unable to articulate what regulation ICP thinks Treasury should enact.  So, we must engage in at least some guesswork.

[12] *See* 10 TEX. ADMIN. CODE § 11.9(d).  A lack of community support would, admittedly, put a project at a disadvantage.  But it wouldn't operate as a true "veto."

[13] 26 U.S.C. § 42(m)(1)(B)(i).

sponsors do. And many of the preference criteria—in both the LIHTC statute and TDHCA's QAP[14]—prioritize building affordable housing projects in low-income areas[15] where the need is greatest, where units can presumably be provided at lower costs, and where rents therefore can remain the lowest for the longest period. That makes sense: "Federal law . . . favors the distribution of [LIHTCs] for the development of housing units *in low-income areas.*" *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2513 (2015) (emphasis added).

Those issues with causation also crystalize ICP's failure to establish redressability. Because it's unclear what effect any Treasury action—whether *ex ante* regulation or *ex post* enforcement—would have on the conduct of project sponsors or investors, it's similarly uncertain that granting ICP the relief it wants would remedy its injuries. ICP's injuries are most directly caused by the location of LIHTC housing units in the Dallas metro. But ICP hasn't shown how it is *likely* that the remedies it seeks will result in (1) LIHTC units being sited in non-minority-concentrated areas, (2) LIHTC units becoming part of concerted community revitalization plans, or (3) the building of specific LIHTC projects for which it pays developers incentive payments.

2.

*Bennett*, on which ICP relies, is easily distinguished. In *Bennett*, 520 U.S. at 157, the challenged action was "a biological opinion issued by the Fish and Wildlife Service [("FWS")] . . . concerning the operation of the Klamath Irrigation Project by the Bureau of Reclamation, and the project's impact on

---

[14] *See id.* § 42(m)(1)(B); 10 TEX. ADMIN. CODE § 11.9(c), (e).

[15] ICP offered statistical evidence that black voucher families live in areas marked by poverty rates greater than 30% and census tracts with the highest distress levels at higher rates than do both Hispanic and white-non-Hispanic voucher families.

two varieties of endangered fish." The challengers' alleged injury was the reduced irrigation water they would receive when the Bureau adopted the Biological Opinion's restrictions on water flow. *See id.* at 167. The Court found that the alleged injury was sufficiently traceable to the challenged action, even though the challengers' water ultimately would be reduced by a later (and at that time undefined) decision by the Bureau. *See id.* at 168–69.

But *Bennett*'s chain of causation was far less attenuated than the one here. In *Bennett*, the critical coercion was FWS's over the Bureau; once FWS coerced the Bureau, that was "determinative" as to the plaintiffs—the quantities of irrigation water available to them would be reduced. *Id.* at 167–69. But on account of a critical difference in procedural posture, there is no similar determinative action here.[16] Instead, both project sponsors and TDHCA will retain significant discretion in proposing projects and allocating LIHTCs.

The chain of causation here more closely resembles those in *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), and *Allen v. Wright*, 468 U.S. 737 (1984), *abrogated on other grounds by Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Like this case, those cases involved chains of causation with at least two links.[17]

---

[16] Unlike this case, *Bennett* was reviewed on a motion to dismiss. *See Bennett*, 520 U.S. at 160–61. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Defs. of Wildlife*, 504 U.S. at 561 (cleaned up). Bennett's complaint alleged that the Bureau of Reclamation would "abide by the restrictions imposed by the Biological Opinion." *Bennett*, 520 U.S. at 160. Because the Court was obligated to accept that allegation, that was enough at the pleadings stage to make FWS's opinion "determinative." But because we review ICP's claim on summary judgment, we face no similar requirement here. *See Defs. of Wildlife*, 504 U.S. at 561.

[17] In *Simon*, 426 U.S. at 32–33, the plaintiffs' alleged injuries were difficulties obtaining medical care from hospitals that offered only certain services to the indigent. The challenged action was IRS Revenue Ruling 69-545, which allowed hospitals that provided only

No. 19-10377

And in each of those, the Court found that standing hadn't been established.[18]

B.

As for OCC, only ICP's first injury—the increased resources ICP spends on account of the lack of LIHTC units located in non-minority-concentrated areas—is relevant. ICP must demonstrate a causal link between that injury and OCC's practice of approving national banks' PWIs in LIHTC projects sited in minority-concentrated areas.

To establish that link, ICP relies on OCC's coercive power to approve national banks' PWIs in LIHTC projects. That approval, ICP avers, is necessary for TDHCA to allocate a LIHTC to a national-bank-funded project, even though TDHCA first tentatively approves the projects. ICP asserts that

---

emergency room services to the indigent to receive favorable federal tax treatment (*i.e.*, non-profit status). *See id.* at 30–32. The theory of causation was that, by protecting the hospitals' nonprofit status, the revenue ruling incentivized hospitals to provide as few services to the indigent as possible.

In *Allen*, 468 U.S. at 756, the plaintiffs' purported injury was "their children's diminished ability to receive an education in a racially integrated [public] school." The challenged activity was "the IRS's grant of tax exemptions to some racially discriminatory [private] schools." *Id.* at 757. The plaintiffs' theory of causation was that, because tax-exempt private schools could discriminate, white children's parents were moving them from public schools under integration orders to racially discriminatory private schools.

[18] In *Simon*, 426 U.S. at 42, the Court found causation lacking because "it [did] not follow . . . that the denial of access to hospital services in fact results from petitioners' new Ruling, or that a court-ordered return by petitioners to their previous policy would result in these respondents' receiving the hospital services they desire." Instead, "[i]t [was] purely speculative whether the denials of service . . . fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." *Id.* at 42–43.

In *Allen*, 468 U.S. at 759, the Court held that the plaintiffs lacked standing because "[t]he links in the chain of causation between the challenged Government conduct and the asserted injury [were] far too weak for the chain as a whole to sustain respondents' standing." That was so because it was "uncertain how many racially discriminatory private schools [were] in fact receiving tax exemptions" and "entirely speculative . . . whether withdrawal of a tax exemption from any particular school would lead the school to change its policies." *Id.* at 758.

13

causation is established because OCC's actions have successfully incentivized national banks to invest significant sums in LIHTC projects.

But that theory misunderstands the nature of OCC's involvement in the LIHTC-allocation process. OCC doesn't itself regulate TDHCA, which allocates the LIHTCs, or project sponsors, who determine which projects to build and where to put them. OCC only approves national banks' proposed PWIs, and it does that only after TDHCA has tentatively allocated an LIHTC (*i.e.*, after the plans have already been made). OCC doesn't have the power to direct national banks to make investments in LIHTC projects or to regulate the myriad other entities (*e.g.*, individuals, partnerships, corporations, local and regional banks, hedge funds, and so on) that may invest in LIHTC projects.

Consequently, the chain of causation as to OCC is even more attenuated than as to Treasury, and, as the district court correctly observed, it's "even weaker than in *Allen* or *Simon*." Just because national bank investments may make up an important component of the LIHTC program doesn't mean that OCC's practice of approving national banks' investments in projects located in minority-concentrated areas *caused* those projects to be sited there. The location of LIHTC projects is driven primarily by sponsors' decisions—both in selecting locations and in finding investors, who may or may not be national banks—and TDHCA's allocation of credits. ICP's evidence doesn't show that requiring OCC to reject approvals for national bank investments in LIHTC projects located in minority-concentrated areas would affect those projects' ultimate locations. Tellingly, ICP hasn't identified a single case in which standing was supported by so attenuated a chain of causation.

As is the case with Treasury, the maladies as to causation show why redressability also is missing. Because OCC regulates only a subset of potential investors in LIHTC projects, it's unclear what effect enjoining OCC from

14

approving investments by those entities would have. Forbidding national banks from investing in LIHTC projects sited in minority-concentrated areas could just as easily have no effect (*e.g.*, because sponsors will seek investments from other types of investors) or have the effect of preventing new LIHTC housing projects from being built at all. That isn't enough to show that it's *likely*—as opposed to a merely *possible*—that granting ICP the relief it requests will affect where future LIHTC projects are built.

\* \* \* \*

In sum, ICP doesn't have standing to sue either Treasury or OCC. Consequently, we AFFIRM the summary judgments as to ICP's claims against OCC and its Section 3608 claim against Treasury. Because the district court reached the merits of ICP's Fifth Amendment claim against Treasury, we VACATE that summary judgment and RENDER a judgment of dismissal for want of jurisdiction.