# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 26, 2022

Lyle W. Cayce
Clerk

No. 22-50690

Texas State LULAC; Voto Latino,

*Plaintiffs—Appellees*,

*versus*

Bruce Elfant, *et al.*,

*Defendants*,

*versus*

Lupe C. Torres, *in her Official Capacity as the Medina County Elections Administrator*; Terrie Pendley, *in her Official Capacity as the Real County Tax Assessor-Collector*; Ken Paxton, *Texas Attorney General*,

*Intervenor Defendants—Appellants*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:21-CV-546

Before Clement, Duncan, and Wilson, *Circuit Judges*.
Stuart Kyle Duncan, *Circuit Judge*:

Plaintiffs are two voter registration organizations who challenged Texas's recently revised requirements for voter residency. The district court concluded Plaintiffs had organizational standing because the new laws caused

No. 22-50690

them to divert resources from other projects and also chilled their ability to advise and register voters. On the merits, the district court ruled that the challenged laws, in large part, impermissibly burdened the right to vote. Texas appealed.

We agree with Texas that Plaintiffs lack organizational standing. So, without reaching the merits, we reverse the district court's judgment and render judgment dismissing Plaintiffs' claims.

I.

During its 2021 regular session, the Texas Legislature enacted over a dozen laws related to election integrity.[1] Among them was S.B. 1111, which became effective on September 1, 2021. *See* Act of May 27, 2021, 87th Leg., R.S., ch. 869, 2021 Tex. Sess. Law Serv. 2142. S.B. 1111 made three relevant changes to the Texas Election Code's residency provisions. *First*, voters whose address on their registration form does not correspond to a physical residence, such as a commercial post-office box, must provide the registrar with documentation of a residential address. *See* TEX. ELEC. CODE §§ 15.051(a), 15.052(a), 15.054 ("P.O. Box Provision"). *Second*, voters are prohibited from establishing or maintaining a residence "for the purpose of influencing the outcome of a certain election." *Id.* § 1.015(b) ("Residence Provision"). *Third*, voters may not "establish a residence at any place the person has not inhabited" or "designate a previous residence as a home and fixed place of habitation unless the person inhabits the place at the time of

---

[1] *See generally* Keith Ingram, *Election Advisory No. 2021-09*, Tex. Sec'y of State (July 30, 2021), https://www.sos.state.tx.us/elections/laws/advisory2021-09.shtml; *see also, e.g.*, Act of June 4, 2021, 87th Leg., R.S., ch. 241, 2021 Tex. Sess. Law Serv. (H.B. 1264) (requiring registrars to send monthly abstract of death certificates of voting-age decedents to voter registrars and Secretary of State); Act of June 14, 2021, 87th Leg., R.S., ch. 573, 2021 Tex. Sess. Law Serv. (S.B. 598) (requiring a risk-limiting audit of certain statewide elections within twenty-four hours of the ballots being counted).

designation and intends to remain." *Id.* § 1.015(f) ("Temporary Relocation Provision"). What links these provisions, according to Texas, is the "fundamental state policy . . . that people should vote where they live."

Months before S.B. 1111 took effect, two voter registration organizations, LULAC and Voto Latino ("Plaintiffs"), sued various county election officials in federal court, seeking to enjoin enforcement of the three provisions. They alleged that (1) the Residence Provision violates the First Amendment by chilling political speech, and (2) all three provisions violate the First, Fourteenth, and Twenty-Sixth Amendments by unduly burdening the right to vote. Texas Attorney General Ken Paxton and other county officials (collectively, "Texas") intervened to defend S.B. 1111.

Following discovery, the parties cross-moved for summary judgment. The district court ruled largely for the Plaintiffs. Addressing standing first, the court ruled Plaintiffs had organizational standing because S.B. 1111 both chilled their speech and caused them to divert resources to counteract the law's effects on their voter registration activities. The court also ruled Plaintiffs had statutory standing under 42 U.S.C. § 1983 given the direct injuries to their pocketbooks and First Amendment rights.

The court then turned to the merits. Addressing the P.O. Box Provision first, the court concluded that the measure "help[ed] the State prevent voter-registration fraud" and that requiring voters to sign and mail a prepaid, preaddressed form confirming a residential address scarcely burdened their right to vote. It therefore upheld the provision, but "with one exception." The court invalidated the provision to the extent it required voters who confirmed a residential address also to include a photocopy of their identification. In such instances, the court thought the prepaid form should serve as a change of address with no further proof of residence needed.

No. 22-50690

Turning to the Residence Provision, the court found it unconstitutionally vague and overbroad. The court rejected the narrowing interpretation proffered by the Texas Secretary of State and concluded that the provision facially prohibited establishing a residence for "obviously permitted purposes such as voting, volunteering with a political campaign, or running for an elected office." Accordingly, the court held the provision severely burdened the right to vote and "fail[ed] any degree of constitutional scrutiny."

Finally, the court also found the Temporary Relocation Provision unconstitutional. The court believed the provision "creates a 'man without a country,'" meaning someone unable to establish residence anywhere in order to vote. For instance, the court read the provision to bar college students from registering either in their college town (because they do not intend to remain there) or in their hometowns (because they are not physically present there). The court thus ruled the provision impermissibly burdened the right to vote.

As a result, the court permanently enjoined enforcement of the Residence Provision and the Temporary Relocation Provision in full, and enforcement of the P.O. Box Provision in part. Texas appealed and we granted its motion for a temporary administrative stay. We now reverse. As explained below, the district court erred in concluding the Plaintiffs have organizational standing to challenge S.B. 1111.

II.

We review summary judgments *de novo*, applying the same standards as the district court. *Guerrero v. Occidental Petroleum Corp.*, 33 F.4th 730, 732 (5th Cir. 2022); Fed. R. Civ. P. 56(a). We also review standing *de novo*. *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1083 (5th Cir. 2022).

III.

Texas argues that Plaintiffs lack organizational standing and, alternatively, that the challenged parts of S.B. 1111 do not unconstitutionally burden the right to vote. Because we agree that Plaintiffs lack organizational standing, we do not address the merits.

"An individual has standing to sue if his injury is traceable to the defendant and a ruling would likely redress it." *Students for Fair Admissions*, 37 F.4th at 1084 n.5 (citing U.S. CONST. art. III, § 2; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). An association may have standing either by showing it can sue on behalf of its members ("associational" standing) or sue in its own right ("organizational" standing). *See id.* at 1084 & n.6; *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020). The district court found Plaintiffs lack associational standing because they failed to identify any members affected by the challenged provisions. However, it found Plaintiffs have organizational standing based on two theories—diversion of resources and chilled speech. We address each in turn.

A.

"The Supreme Court has recognized that when an organization's ability to pursue its mission is 'perceptibly impaired' because it has 'diverted significant resources to counteract the defendant's conduct,' it has suffered an injury under Article III." *Tenth St. Residential Ass'n*, 968 F.3d at 500 (quoting *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Such an injury must be "concrete and demonstrable." *City of Kyle*, 626 F.3d at 238 (quoting *Havens Realty*, 455 U.S. at 379). An organization can show standing via diversionary injury by identifying "specific projects that [it] had to put on

hold or otherwise curtail in order to respond to the [challenged laws]." *Ibid.* (citing *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000)).

According to the district court, Plaintiffs identified "specific projects" curtailed due to Plaintiffs' spending money to counteract S.B. 1111: namely, certain of LULAC's scholarship and law-reform programs, as well as Voto Latino's voter-registration efforts outside Texas. The court noted that 2022 was "the first year since 2010 that Voto Latino will be unable to run a voter-registration drive in Colorado." The court also observed that "LULAC is, for the first time, 'spending over maybe $1 million to $2 million in Texas' to counteract election laws like S.B. 1111." Texas responds that the evidence fails to link Plaintiffs' claimed diversion of resources to S.B. 1111. We agree with Texas.

Testimony from LULAC and Voto Latino representatives consistently attributed their diversion of resources, not to S.B. 1111 specifically, but to a broader group of election-related laws enacted in Texas and other states. Emblematic is this exchange between Texas's counsel and a Voto Latino representative. When asked "[h]ow is Voto Latino injured by SB 1111," the response was, in relevant part:

> *As a result of SB 1111 and all the other laws that came into effect post-January*, we had to reallocate our funding and lower our goals to concentrate on voter education.
>
> And so we lowered our goals in voter registration roughly about 25 percent and for voter outreach roughly at one point for 1.3 million to 500,000 so that's roughly about 62 percent—60 percent. And then we also had *because there—the laws that were passed in the state of Texas and others, we actually had to shut down our Colorado program*.
>
> It'll be the very first time that we are not doing voter registration and education in Colorado since 2010. And because of the things that I think we can all appreciate is that

No. 22-50690

there is not infinite amount of money or time. And so I've also—we've also had to retool and teach our volunteers, educate them, *provide information around primaries specifically to SB 1111 and the other—the other laws as well*, and spent time on my counsel filing this lawsuit and the list goes on.[2]

ROA.1258–59 (emphases added). Similarly, LULAC's representative was asked whether the organization had to divert funds from immigration and criminal justice reform projects "on account of SB 1111 specifically." The witness avoided giving a definite answer. Instead, he responded: "We're going to reduce those efforts, and it's not only SB 1111, but SB 1, it's both."[3]

Even assuming this evidence adequately shows a diversionary injury under Article III, it fails to link any diversion of resources specifically to S.B. 1111. It is not enough merely to claim the organizations have spent money to counteract "S.B. 1111 and all the other [election] laws" passed in Texas and in other states around the same time. An organizational plaintiff must show it diverted resources "as a direct result of" the challenged law—not as a result of the challenged law and others like it. *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999) ["*ACORN*"]; *see also City of Kyle*, 626 F.3d at 238 (explaining the diversion of resources must be made "in order to respond to the [challenged law]"). Plaintiffs have not done so here. Therefore, they fail to satisfy the traceability and redressability prongs of

---

[2] To the extent Plaintiffs rely on the assertion that they "spent time on . . . counsel filing this lawsuit," our precedents squarely reject the notion that a diversionary injury can be shown by "the mere fact that an organization redirects some of its resources to litigation and legal counseling." *La. ACORN*, 211 F.3d at 305 (cleaned up).

[3] S.B. 1 is a wide-ranging election integrity law recently enacted in Texas. Among other things, it imposes criminal penalties for certain forms of intentional voter fraud and requires the Secretary of State to carry out periodic, randomized audits of election results. *See* Texas Election Integrity Act of 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Sess. Law Serv. 3783. LULAC has separately challenged parts of S.B. 1. *See La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-844 (W.D. Tex.).

Article III standing. *See, e.g.*, *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) ("'Th[at] triad of injury-in-fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement[.]'" (first alteration in original) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1988))).

Contrast Plaintiffs' meager showing on this point with the concrete showing our court required to prove organizational standing in *ACORN*. There, the organizational plaintiff challenged Louisiana's alleged lack of compliance with the National Voter Registration Act ("NVRA"), which required the state to facilitate voter registration at public aid offices. *ACORN*, 178 F.3d at 360. The organization presented specific evidence that it regularly conducted voter registration drives in Louisiana, registering people at "welfare waiting rooms, unemployment offices, and on Food Stamp lines," and concentrating its efforts in areas where households receiving food stamps had low rates of voter registration. *Id.* at 361. We found that this detailed showing was sufficient evidence that the organization had "expended resources registering voters in low registration areas who would have already been registered if [Louisiana] had complied with the [public aid] requirement under the NVRA[.]" *Ibid.* In other words, concrete evidence showed the organization's diversion of resources was a direct response to the defendant's challenged actions and, as such, satisfied the injury, traceability, and redressability prongs of Article III standing. Here, by contrast, Plaintiffs have merely made vague assertions that they diverted resources in response to "S.B. 1111 and all the other laws," both inside and outside Texas.[4]

---

[4] While "general factual allegations of injury resulting from the defendant's conduct may suffice" at the pleadings stage, more is required to survive summary judgment, as here. *ACORN*, 178 F.3d at 354 (citation omitted). To demonstrate standing

We therefore cannot agree with the district court that Plaintiffs showed they curtailed "specific projects" in order to counteract S.B. 1111. For instance, the district court noted that "[t]his is the first year since 2010 that Voto Latino will be unable to run a voter-registration drive in Colorado." But the evidence did not show that the Colorado program was suspended because of money Voto Latino had to spend on S.B. 1111. Rather, the testimony was that "because [of] . . . *the laws that were passed in the state of Texas and others*, we actually had to shut down our Colorado program." ROA.1259 (emphasis added).[5] The court also observed that LULAC was spending "$1 million to $2 million in Texas, to counteract election laws *like S.B. 1111*." ROA.1914 (emphasis added). Again, this is not sufficient. Plaintiffs sued to enjoin S.B. 1111—not "laws like S.B. 1111."

In sum, Plaintiffs failed to demonstrate their own standing to challenge S.B. 1111 based on diversion of resources. We can assume without deciding that Plaintiffs' testimony about diverted funding adequately shows an injury-in-fact. *See Inclusive Cmtys. Project*, 946 F.3d at 656 n.9 (assuming injury-in-fact). Even so, Plaintiffs did not show that the diversion was a direct response to S.B. 1111 specifically, as opposed to an undifferentiated group of recent election laws in Texas and elsewhere. Plaintiffs thus failed to show that their claimed injury was traceable to S.B. 1111. *See Bennett v. Spear*, 520

at this stage, Plaintiffs "must point to specific summary judgment evidence showing that it was 'directly affected' by [Texas's] alleged . . . violations." *Ibid.* (citation omitted).

[5] Later in her deposition, the same witness suggested that "shutting down the Colorado program" was "specifically" due to S.B. 1111. But the witness did not try to explain why spending money on S.B. 1111, in contrast to all the other election laws in Texas and elsewhere, caused suspension of the Colorado program. More specificity is needed to show that resources were diverted "as a direct result" of the challenged law. *ACORN*, 178 F.3d at 360. In any event, a few pages earlier, the same witness attributed suspension of the Colorado program, not specifically to S.B. 1111, but to "the laws that were passed in the state of Texas and others."

U.S. 154, 162 (1997) (standing requires injury to be "fairly traceable to the challenged actions of the defendant"); *ACORN*, 178 F.3d at 359 (holding diversion of resources must be "fairly traceable" to the "conduct . . . that [plaintiff] claims in its complaint is illegal"). For similar reasons, Plaintiffs also failed to show redressability. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (redressability requires that "a favorable decision will relieve a *discrete* injury to [the plaintiff]") (emphasis added). If Plaintiffs' injury arose from various election laws in Texas and elsewhere, as the testimony at most suggests, enjoining S.B. 1111 would not likely redress the drain on their resources. *See Leal v. Becerra*, No. 21-10302, 2022 WL 2981427, at *2 (5th Cir. July 27, 2022) (unpublished) ("Redressability is also a problem when declaring one law unenforceable may not provide relief because a different law independently causes the same injury.").

In sum, the district court erred in concluding Plaintiffs had standing based on a diversion-of-resources theory.

## B.

We turn to Plaintiffs' second theory of organizational standing, namely that the threatened enforcement of S.B. 1111 chills their speech. A plaintiff suffers an Article III injury if the credible threat of a law's enforcement chills his speech or causes self-censorship. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014); *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021). The chilling effect must have an objective basis; "[a]llegations of a subjective 'chill' are not an adequate substitute . . . ." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). To assess standing on this basis, we ask (1) whether the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest; (2) whether that conduct is arguably proscribed by the challenged policy; and (3) whether the threat of

future enforcement is substantial. *Barilla*, 13 F.4th at 431–432 (citing *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020)).

The district court held that Texas's threatened enforcement of S.B. 1111 objectively chills Plaintiffs' First Amendment right to conduct voter registration drives and engage with prospective voters. It credited Plaintiffs' fear of being prosecuted if they gave advice to voters that conflicted with S.B. 1111. This fear was credible, the court reasoned, because helping someone commit voter fraud is a crime and because of Texas's avowed priority of combatting voter fraud. We disagree.

Plaintiffs fail prongs two and three of the governing test. While Plaintiffs may have a constitutional interest in conducting voter registration drives, they have not shown under prong two that this conduct is "arguably proscribed" by S.B. 1111. *Barilla*, 13 F.4th at 431 (quoting *Speech First*, 979 F.3d at 330) (cleaned up). Plaintiffs must "establish a serious intention to engage in conduct proscribed by law," *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018), but neither S.B. 1111 nor any other law cited by Plaintiffs arguably prohibits Plaintiffs' activities.

Plaintiffs argue that it is "a crime under Texas law to help someone to register to vote in violation of [S.B. 1111's] confusing new requirements." But Texas law does not criminalize giving good faith but mistaken advice to prospective voters. Rather, the statute on which Plaintiffs rely applies only "if the person *knowingly or intentionally*" "requests, commands, coerces, or attempts to induce another person to make a false statement on a [voter] registration application." TEX. ELEC. CODE § 13.007(a) (emphasis added). *See also* TEX. PENAL CODE §7.02(a)(2) (making a party criminally liable for another's offense only if he "act[s] with intent to promote or assist the commission of the offense"). Plaintiffs do not assert that they plan to "knowingly or intentionally" encourage people to register who are ineligible

under S.B. 1111. Plaintiffs' argument turns on the "confusion and uncertainty" S.B. 1111 supposedly injects into their voter outreach efforts. Uncertainty is not the same as intent, however. Accordingly, Plaintiffs have not shown a serious intention to engage in protected activity arguably proscribed by the challenged law.

Plaintiffs also lack standing under prong three because there is no credible threat they will be prosecuted. *Barilla*, 13 F.4th at 432. The fanciful notion that Plaintiffs will be charged under S.B. 1111 depends on a "highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Consider all the dominoes that would have to fall:

1. Plaintiffs "knowingly or intentionally" encourage or induce someone to vote or register to vote in violation of S.B. 1111.
2. That person intentionally votes illegally or intentionally submits a false registration form.
3. The voter registrar discovers the violation and refers it to a prosecutor.
4. The prosecutor unearths the initial connection between the offender and Plaintiffs.
5. The prosecutor determines Plaintiffs intentionally violated S.B. 1111.
6. The prosecutor exercises his discretion to bring charges against Plaintiffs.

This does not add up to a credible threat of Plaintiffs' being prosecuted for inducing a prospective voter to violate S.B. 1111. *See Zimmerman*, 881 F.3d at 390 (no credible risk of enforcement where the circumstances leading to prosecution were "speculative and depend[ed] in large part on the action of third-part[ies]").

In response, citing our *Barilla* decision, Plaintiffs argue that we must presume a credible threat of prosecution because this is a pre-enforcement

challenge. *See Barilla*, 13 F.4th at 432. They are mistaken. The presumption Plaintiffs rely on applies to "pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs." *Ibid.* (quoting *Speech First*, 979 F.3d at 335). But S.B. 1111 does not facially restrict any of Plaintiffs' expressive activities. S.B. 1111 applies to voters, not organizations like Plaintiffs who advise and register voters. S.B. 1111 therefore does not facially restrict Plaintiffs' ability to engage in their expressive conduct, and the presumption of a credible threat of prosecution does not apply.[6]

In sum, the district court erred in concluding Plaintiffs had organizational standing based on a chilled-speech theory.

## IV.

Because Plaintiffs lack standing, the district court lacked subject matter jurisdiction. We therefore REVERSE the district court's judgment and RENDER judgment dismissing Plaintiffs' claims.

REVERSED and RENDERED.

---

[6] Even if the presumption applied, it can be rebutted by "compelling contrary evidence." *See Barilla*, 13 F.4th at 432 (noting that "courts will assume a credible threat of prosecution in the absence of compelling contrary evidence") (citing *Speech First*, 979 F.3d at 335). Such evidence abounds here, given the number of stars that would have to align before Plaintiffs could be prosecuted for violating S.B. 1111. *See supra.*