**REVISED October 30, 2020**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-50529

United States Court of Appeals
Fifth Circuit

**FILED**
October 28, 2020

Lyle W. Cayce
Clerk

SPEECH FIRST, INCORPORATED,

     Plaintiff - Appellant

v.

GREGORY L. FENVES, In His Official Capacity as
President of the University of Texas at Austin,

     Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas

Before KING, JONES, and COSTA, Circuit Judges.[1]

EDITH H. JONES, Circuit Judge:

On behalf of a group of students, Speech First, Inc., appeals the dismissal of its First and Fourteenth Amendment challenges to several policies that intend to regulate speech at the University of Texas at Austin. After Speech First sought a preliminary injunction against enforcement of these policies, and the University responded, the district court dismissed the case on the basis that Speech First lacked standing. This conclusion was mistaken. The chilling effect of allegedly vague regulations, coupled with a range of potential

---

[1] Judge Costa concurs in the judgment.

penalties for violating the regulations, was, as other courts have held,[2] sufficient "injury" to ensure that Speech First "has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 158, 134 S. Ct. 2334, 2341 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205 (1975)).

## BACKGROUND

Speech First, Inc., ("Speech First") is an organization of free-speech advocates that includes students at the University of Texas at Austin ("the University"). Speech First sued the Defendant-Appellee, Gregory L. Fenves, in his official capacity as president of the University, in December 2018. At that time, the University had promulgated four policies governing students' speech: (1) the 2018-2019 General Information Catalog, Appendix C, Institutional Rules on Students Services and Activities; (2) the Acceptable Use Policy for University Students (last revised in 2015); (3) the 2018-2019 Residence Hall Manual; and (4) the Handbook of Operating Procedures (revised no later than March 2017). Here are the pertinent portions of the regulations.

### 1. The Institutional Rules

Fenves describes the Institutional Rules as "bedrock standards to which all University community members must adhere." The Rules' Chapter 13 is titled "Speech, Expression, and Assembly," and begins generally, declaring the "freedoms of speech, expression, and assembly" to be "fundamental rights of all persons." Section 13-101. This section pronounces students' (and others') freedom to "express their views . . . on any topic . . . subject only to rules

---

[2] *See, e.g., Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995) (affirming that campus discriminatory harassment speech policy is, on its face, unconstitutionally overbroad and vague, after district court found that students had standing to sue despite lack of enforcement against them).

necessary to preserve the equal rights of others and the other functions of the University."   The section disclaims viewpoint discrimination "[e]xcept as expressly authorized by subchapter 13-200 [titled, "Prohibited Expression"].

In the next subchapter, "Prohibited Expression" includes paragraphs covering obscenity, defamation, and incitement to imminent violations of law. By far the longest prohibition covers "Harassment," which is the "mak[ing], distribut[ing], or display[ing] on the campus any statement that constitutes verbal harassment of another."  "Verbal harassment" is defined as "hostile or offensive speech, oral, written, or symbolic," that:

> A. is not necessary to the expression of any idea described in the following subsection ["an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea is not verbal harassment even if some listeners are offended by the argument or idea"];
> B. is sufficiently severe, pervasive, or persistent to create an objectively hostile environment that interferes with or diminishes the victim's ability to participate in or benefit from the services, activities, or privileges provided by the University; and
> C. personally describes or is personally directed to one or more specific individuals.

The Rules elaborate that "[v]erbal harassment may consist of threats, insults, epithets, ridicule, [and] personal attacks," and "is often based on the victim's appearance, personal characteristics, or group membership, including but not limited to race, color, religion, national origin, gender, age, disability, citizenship, veteran status, sexual orientation, gender identity or gender expression, ideology, political views, or political affiliation."

Under the Rules, the Dean of Students has primary authority and responsibility for the administration of student discipline, but other University actors play various roles in responding to particular types of alleged violations.

No. 19-50529

Disciplinary sanctions range from written warning to suspension, expulsion, and the denial of a degree.

## 2. Acceptable Use Policy

The Acceptable Use Policy outlines permitted and prohibited uses of the information technology devices and systems provided and maintained by the University. Under the Policy "[a]ll university students granted access to or use of university Information Resources must be aware of and agree to abide by [certain] acceptable use requirements." Among these "requirements" is:

> **5.6** Be civil. Do not send rude or harassing correspondence.
>
> 1. If someone asks you to stop communicating with him or her, you should. If you fail to do so, the person can file a complaint and you can be disciplined.
> 2. If you ever feel that you are being harassed, university staff members will assist you in filing a complaint. . . .

"The authoritative source on [the Acceptable Use Policy] and responsibility for its implementation rests with the Office of the Associate Vice President and Chief Information Officer," although other offices may be involved in discipline relating to the requirements. The Policy provides a non-exhaustive list of "[p]unishment[s] for infractions of [the requirements]," ranging from "[v]erbal warnings" to "[s]uspension from the university" or "[c]riminal prosecution." The Policy notes that suspension from the University happens to "several people each semester."

On the other hand, the Policy notes, "In general, expressions of opinion by members of the university community that do not otherwise violate state and federal laws or university rules are protected as 'free speech.'" Also: "Disagreements between people, even heated arguments, unless threatening or otherwise unlawful, are not considered violations. UT Austin does, however, strongly encourage all its users to be polite and courteous."

4

### 3. Residence Hall Manual

The "Personal Responsibility and Student Conduct" section of the Residence Hall Manual includes sections on "Harassment" and "Incivility."

Under "Harassment," the University states a policy "to maintain an educational environment free from harassment and intimidation" and states a related "commit[ment] to responding appropriately to acts of racism, sexism, heterosexism, cissexism, ageism, ableism, and any other force that seeks to suppress another individual or group of individuals."  "When acts of harassment or intimidation occur in the residence hall environment, the Residence Life staff, in conjunction with the Residence Hall Council, may lead a floor or hall meeting to discuss the incident and decide, as a community, appropriate steps that need to be taken to address the incident."  More generally, "[r]esidents who are suspected to have engaged in harassment as defined in the Institutional Rules will be referred to the Dean of Students for possible disciplinary action."

Immediately following, under "Incivility," the University states:

Students are expected to behave in a civil manner that is respectful of their community and does not disrupt academic or residential activity. Uncivil behaviors and language that interfere with the privacy, health, welfare, individuality, or safety of other persons are not permitted.

At the end of the "Personal Responsibility and Student Conduct" section, there is a subsection on the "Conduct Process," which explains the process for "cases that remain in Housing for adjudication."  This process may result in "Housing Sanctions," which are "educational measure[s] implemented by the Housing Conduct Board or Residence Hall Conduct Administrator designed to affect [sic] a change in behavior and to help the student understand how their behavior impacted others in the residence hall community."  "Sanctions" might

include "loss of privileges," "assign[ments]" such as "on-line educational modules, meetings with University staff members, educational/reflection papers, poster assignments, or presentations at hall meetings," or "administrative sanctions" such as a forced room change, fine, or bar on the student's record.

### 4. Hate and Bias Incidents Policy and CCRT

Finally, within the University's Handbook of operating procedures is the "Hate and Bias Incidents" policy. According to its "Policy Statement," the University "unequivocally condemns and prohibits . . . harassment," "is committed to an academic and work environment free from acts of intolerance, hate, bias or prejudice," and "is committed to the principles of free inquiry and expression and is dedicated to creating an environment where the expansion of knowledge and the freedom to exchange ideas is safeguarded."

The Hate and Bias Incidents policy describes verbal harassment in the same language as the Institutional Rules. It specifies that individuals may report threatened or actual "harassment" to the Office of the Dean of Students or the Office of Inclusion and Equity.

The policy's "Responsibilities & Procedures" section includes a "Campus Climate Incident" subsection, which states:

> The University strongly encourages individuals who believe they have been discriminated against or have experienced threatened or actual violence on the basis of their race, color, religion, national origin, gender, gender identity or gender expression, age, disability, citizenship, veteran status, sexual orientation, ideology, political views, or political affiliation to report such incidents as provided in this policy.
>
> Individuals may report a campus climate incident to the University's *Campus Climate Response Team* by clicking on the "Report a Bias Incident Campus Climate Response Team" button . . . . Individuals may report concerns such as a student

organization hosting a party with a racist theme, derogatory graffiti regarding sexual orientation or gender identity and expression, malicious threats that intimidate another person because of his or her religion or concerns that someone has created a hostile or offensive classroom environment.

The Campus Climate Response Team ("CCRT") was instituted in 2011 after an investigation into whether the university's dispute resolution procedures were sufficient to handle outbreaks of "hateful or violent speech." The CCRT is described as "a university-wide strategy resource team that develops and facilitates the implementation of appropriate responses to campus climate incidents impacting the UT Austin community." "[C]ore functions" of the CCRT include "[g]athering information and managing the specific incident," "[s]upporting individuals involved in an incident," "[i]dentifying and connecting with appropriate support services," "[e]valuating the response process post incident," and "[c]oordinating, when appropriate, activities with other campus-wide entities, especially those involved with crisis management." Last, the University hopes that "through the work of the CCRT, potential gaps in UT Austin policies and procedures that may impede the university's ability to minimize campus climate incidents may be addressed."

The CCRT acts in response to campus climate incident reports, which may be filed online by the "victim" of an alleged incident, a witness, or any third party "who was informed of the incident but was not present at the time of its occurrence." The reports may be anonymous. Upon filing, usually online, the report is examined by the CCRT Lead Team "to determine whether the situation, as reported, falls within the parameters of a campus climate incident or whether the incident should be referred to other response teams or offices." CCRT Lead Team members "will also determine if there is a possible violation of the [Institutional Rules]." Among other responses, the CCRT may decide to

provide "support and information to student(s), staff or faculty who initiated the incident."

Following the provision relating to the CCRT, the Hate and Bias Incidents Policy (re)authorizes the sanctions listed in the Institutional Rules and assures that "a discriminatory purpose will be treated as an aggravating factor for the purpose of determining the appropriate sanction(s)."

### District Court Proceedings

Speech First challenged all of these policies on their face. Nicole Neily, the president of Speech First, stated in a sworn declaration that the organization's members "hold a wide array of different views and opinions on matters such as politics, race, religion, gender identity, abortion, gun rights, immigration, foreign affairs, and countless other sensitive and controversial topics." She stated further that Speech First's members at the University "want to be able to have open and robust intellectual debates and discussion about these issues in their dormitories, on campus, online, and in the City of Austin," but they are "afraid to voice their views out of fear that their speech may be considered 'offensive,' 'biased,' 'rude,' 'uncivil,' or 'harassing.'" That is, they "fear that they will be investigated or punished by the University for engaging in speech or expression that is protected by the First Amendment."

In its complaint, Speech First described more specifically the views of its student-members at the University. For example, it stated that one student-member considers herself a "Tea Party conservative," "strongly supports Israel, believes in a race-blind society, supports President Trump, is pro-life, and supports the border wall." Another student-member "strongly supports the Second Amendment right to keep and bear arms, believes in a race-blind society, and has serious concerns that the 'Me Too' movement will erode due process." He thinks "affirmative action should be prohibited and that Justice

Brett Kavanaugh was innocent of the accusations made against him and was properly confirmed to the U.S. Supreme Court." A third student-member "believes that the breakdown of the nuclear family has had many negative effects on society, he is strongly pro-life, he strongly supports the Second Amendment, and he believes that Justice Kavanaugh was treated unfairly during his confirmation proceedings."

Speech First sought a declaratory judgment that "the University's prohibition on 'verbal harassment,'" its "prohibitions on incivility, rudeness, and harassment in section 5.6 of the Acceptable Use Policy," and its "prohibitions on harassment, intimidation, and incivility in the Residence Hall Manual" violate the First and Fourteenth Amendments. It also sought a declaratory judgment that "the CCRT and its prohibitions on 'bias incidents' and 'campus climate incidents' violate the First and Fourteenth Amendments." Speech First sought a permanent injunction prohibiting University officials from "taking any actions to investigate, threaten, or punish students for violations of the [allegedly unconstitutional policies]" and from "using the CCRT to investigate, threaten, or punish students (including informal punishments) for 'bias incidents' or 'campus climate incidents.'"

Soon after filing its complaint, Speech First moved for a preliminary injunction against enforcement of the challenged policies and against use of the CCRT to investigate, log, threaten, or punish students for bias incidents. The University opposed the motion and attached declarations from a number of University officials. The court convened a non-evidentiary hearing directed at the preliminary injunction motion alone.

A couple months later, the court issued an opinion dismissing Speech First's case for lack of standing. The court ruled that Speech First had failed to present "specific evidence of the speech in which the students wish to

engage," leaving the court unable to determine whether the students "have an intention to engage in speech that is prohibited or arguably covered by the challenged policies." The court discerned "no evidence that any University students . . . have been disciplined, sanctioned, or investigated for their speech," and thus no "credible threat of enforcement of the challenged policies." Concluding that Speech First failed to make a clear showing of standing and thus lacked standing to sue, the court not only denied the preliminary injunction but dismissed the case.

Speech First filed its timely notice of appeal on June 6, 2019. Numerous amici filed briefs in support of Speech First. Unexpectedly, in August, pending appeal, the University amended its policies. First, it changed the prohibition on harassment in the Institutional Rules from banning "hostile or *offensive* speech" that is "severe, pervasive, *or offensive*" to banning "hostile or *threatening*" speech that is "severe, pervasive, *and objectively offensive*" (emphasis added). Second, the University eliminated the Acceptable Use Policy's references to "civil" and "[not] rude or harassing correspondence." Third, the University eliminated the Residence Hall Manual's prohibition on "uncivil behaviors and language" and redefined the Manual's harassment rule to match strictly the Institutional Rules. *See* The University of Texas at Austin, 2019 - 2020 Residence Hall Manual 16 (Aug. 29, 2019), https://housing.utexas.edu/sites/default/files /ResidenceHallManual_ 10182019.pdf. Fourth, the University changed the Manual's disciplinary process for harassment in order to channel all allegations of harassment directly to the Dean of Students, thus eliminating the separate Housing disciplinary process. *See id.*

The University did not change either the CCRT or the Hate and Bias Incidents Policy, according to which the University continues to "unequivocally

No. 19-50529

condemn[] and prohibit[] . . . harassment," defined as "hostile or offensive speech" that is "sufficiently severe, pervasive, or offensive so as to interfere with an individual or group's academic or work performance, or to create a hostile work or academic environment." The University of Texas at Austin, Hate and Bias Incidents Policy (Mar 8, 2017), https://policies.utexas.edu/policies/hate-and-bias-incidents. The policy remains enforceable as originally written. Students are "strongly encourage[d]" to report such speech to the CCRT. *Id.*

## DISCUSSION

On appeal, Speech First seeks, at least, to reverse the district court's dismissal for lack of standing. The University supports dismissal, but also contends that its policy amendments render moot appellant's challenges to the original policies. We start with mootness.

### I. Mootness

Because "the University consolidated and revised its policies governing expressive activities in time for the 2019–20 school year," Fenves contends, "Speech First's challenges to the Use Policy and Residence Hall Manual are focused exclusively on language that was eliminated by the University's recent revisions." In addition to touting the changes, Fenves's brief states that "the University has no plans to, and will not, reenact the former policies." As a result, Speech First's challenges to the original versions of the Institutional Rules, Use Policy, and Residence Hall Manual have allegedly become moot.

In general, "'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice,' even in cases in which injunctive relief is sought." *Meza v. Livingston*, 607 F.3d 392, 399–400 (5th Cir. 2010) (quoting *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S. Ct. 1070, 1074 (1982)). That

11

general rule is not absolute, but "[v]oluntary cessation of challenged conduct" moots a case "only if it is '*absolutely* clear that the allegedly wrongful behavior could not be reasonably expected to recur.'" *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222, 120 S. Ct. 722, 725 (2000) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203, 89 S. Ct. 361, 364 (1968)).

In some cases this court has "treat[ed] a voluntary governmental cessation of possibly wrongful conduct with some solicitude," *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277, 131 S. Ct. 1651 (2011), but this relaxed standard has not been applied to voluntary cessation by a public university. We do not adopt the relaxed standard, but assume its applicability *arguendo* for purposes of this case.

Even applying "some solicitude," however, the continuing existence of the unaltered definition of "harassment" in the Hate and Bias Incidents Policy does not make it "absolutely clear" that the University will not reinstate its original policies. After all, that Policy maintains the exact definition of harassment that was eliminated from the Institutional Rules. Of course, the University could reconcile the contradictory policies by revising the Hate and Bias Incidents Policy to align with the newly fashioned Institutional Rules, but it could easily reconcile them in the opposite way. On that basis alone, the partial voluntary cessation does not moot this case.

Mootness by voluntary cessation is further inadvisable to avoid a circuit split. This is not the first appeal in which a public university has had a sudden change of heart, during litigation, about the overbreadth and vagueness of its speech code, and then advocated mootness under a relaxed standard. In *Speech First, Inc. v. Schlissel*, the Sixth Circuit considered the alleged

12

No. 19-50529

mootness of challenges to speech codes at the University of Michigan. 939 F.3d 756, 767–70 (6th Cir. 2019). The *Schlissel* court "presume[d] that the same allegedly wrongful conduct by the government is unlikely to recur." *Id.* at 767. Yet the Sixth Circuit held that presumption defeated for three reasons: (1) the absence of a controlling statement of future intention; (2) the suspicious timing of the change; and (3) the university's continued defense of the challenged policies. *Id.* at 769–70. Following *Schlissel*, this case is not moot.

To the first point, the University has not issued a controlling statement of future intention. Of course, Fenves, in his official capacity, represents in his brief that "[t]he University has no plans to, and will not, reenact the former policies." *Schlissel,* in contrast, reviewed sworn testimony to determine whether "the University has . . . affirmatively stated that it does not intend to reenact the challenged definitions." 939 F.3d at 769. The University advances no such sworn affirmative statement here. *Schlissel* looked to "evidence in the record that [the person making a statement] . . . has control over whether the University will reimplement the challenged definitions." There is no evidence here that Fenves controls whether the University will restore the challenged definitions during or after his tenure. *Cf. United States v. Atkins*, 323 F.2d 733, 739 (5th Cir. 1963); *ACLU v. Fla. Bar*, 999 F.2d 1486, 1494 (11th Cir. 1993). Indeed, the newly made policy amendments are being submitted to the Board of Regents for consideration sometime this year.[3] Thus, Fenves's statements in brief are not a controlling statement of future intention.

---

[3] *Cf. N.Y. State Rifle & Pistol Ass'n v. City of New York*, No. 18-280, 2020 WL 1978708, at *1 (U.S. Apr. 27, 2020) (mootness resulted when City exercised its formal legislative powers to change an ordinance and "the State enacted a law making the old New York City ordinance illegal," *id.* at *2 (Alito, J., dissenting)).

13

No. 19-50529

Second, the timing of the University's policy amendments is at least as suspicious as was the timing of the changes in *Schlissel*. In that case, the university changed its policies after the complaint was filed, albeit as part of a review process that preceded litigation. 939 F.3d at 769. In this case, the University did not commence review, much less change its policies, until after the district court decision. The changes were first announced only in the University's appellate brief. *Cf. Knox v. SEIU*, 567 U.S. 298, 307, 132 S. Ct. 2277, 2287 (2012) ("[M]aneuvers designed to insulate a decision from review by this Court must be viewed with a critical eye."). The University does not "explain the expedient timing of the [policies'] removal." *Schlissel*, 939 F.3d at 770.

Finally, Fenves continues to defend the original policies originally as it did in the district court. His brief states, "The plain text of the challenged policies makes clear that *none of the challenged policies . . .* prohibits any constitutionally protected speech in general, and the types of speech in which Speech First's members wish to engage in particular." (emphasis added). Although the points that follow extend to all the University provisions, original and amended, the University's definitions of arguably protected conduct and the alleged lack of a history of past enforcement necessarily involve the pre-existing policies. As in *Schlissel,* the University is still defending the legality of its original policies.

Even if *Schlissel* required all three bases of its ruling to preclude mootness,[4] all of them obtain here. Accordingly, even under *Schlissel*'s relaxed presumption in favor of a university's voluntary cessation (which we apply only

---

[4] *Cf. DeJohn v. Temple Univ.*, 537 F.3d 301, 311 (3d Cir. 2008) (rejecting mootness by voluntary cessation after considering only the timing of a policy change and continued defense of contested policy).

No. 19-50529

*arguendo)*, Fenves has not shown an absolute certainty that the original provisions of its Institution Rules, Acceptable Use Policy, and Residence Hall Manual will not be reinstituted. Nor has Fenves even alleged mootness regarding the CCRT. Speech First's challenges are not moot.

## II. Standing

A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue. At earlier stages of litigation, however, the manner and degree of evidence required to show standing is less than at later stages. *See Lujan v. Def's of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130 (1992) ("each element [of standing] must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation"). At the preliminary injunction stage, the movant must clearly show only that each element of standing is likely to obtain in the case at hand. *Compare Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017), *with Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 568–69 (5th Cir. 2010); *see also Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

Because Speech First seeks a preliminary injunction on behalf of its members, it must clearly show that it likely has *associational* standing to bring its case on the merits. Speech First satisfies that requirement if it shows a likelihood that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 282,

No. 19-50529

106 S. Ct. 2523, 2529 (1986) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977)).

The only one of those criteria disputed here is whether it is likely that any of Speech First's members would have standing to sue in his own right.[5] To have standing, a plaintiff must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision. *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130 (1992).

A plaintiff has suffered an injury in fact if he (1) has an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) his intended future conduct is "arguably . . . proscribed by [the policy in question]," and (3) "the threat of future enforcement of the [challenged policies] is substantial." *See Susan B. Anthony List*, 573 U.S. at 161–64, 134 S. Ct. at 2343–45. For purposes of a preliminary junction, Speech First must clearly show a likelihood that at least one of its members suffered such an injury.

The gravamen of Speech First's claims is that its student-members wish to engage in robust debate on timely and controversial political topics from a contrarian point of view. Because their views do not mirror those of many on campus, their speech may be deemed "harassment," "rude," "uncivil," or "offensive," as those terms are defined in the University's policies. Their speech may also credibly run afoul of the Hate and Bias Incidents Policy and may be investigated by the CCRT. Either way, credible threats of enforcement exist under these policies or through referral from the CCRT. Alleging a facial

---

[5] The latter two elements of associational standing are uncontested. Speech First's purpose is "to preserv[e] civil rights secured by law, including the freedom of speech guaranteed by the First Amendment to the U.S. Constitution," especially for the sake of "students and others at colleges and universities, through litigation and other lawful means." The student speech interests are germane to its purpose, and neither the claims nor the relief sought require the participation of individual members in the lawsuit.

challenge to these rules, Speech First insists that its members' First Amendment rights have been chilled, their speech deterred, by the prospect of adverse application of the policies.

This court has repeatedly held, in the pre-enforcement context, that "[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Houston Chronicle v. City of League City,* 488 F.3d 613, 618 (5th Cir. 2007). *See also Freedom Path, Inc. v. I.R.S.,* 913 F.3d 503, 507 (5th Cir. 2019) (same); *Fairchild v. Liberty ISD*, 597 F.3d 747, 754–55 (5th Cir. 2010) (same); *Ctr. for Individual Freedom v. Carmouche,* 449 F.3d 655, 660 (5th Cir. 2010) (same) ("As the district court noted, '[t]he First Amendment challenge has unique standing issues because of the chilling effect, self-censorship, and in fact the very special nature of political speech itself.'").[6] It is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech.

### A. Intention to Engage in Protected Conduct

Concerning the first criterion enunciated in *Susan B. Anthony List,* Fenves attempts only in a footnote to defend the district court's erroneous conclusion that Speech First did not adequately support its members' intentions to engage in speech protected by the First Amendment. Speech First's complaint alleged that one of its student-members at the University "wants to engage in open and robust intellectual debate with her fellow students" about, for example, "open borders and the protection of illegal immigrants," "the BDS movement to end support for Israel," and opposition to

---

[6] Other circuits concur. *See, e.g., Ariz. Right to Life PAC v. Bayless,* 320 F.3d 1002, 1006 (9th Cir. 2003) (plaintiff forced to modify political behavior had standing); *Majors v. Abell,* 317 F.3d 719, 721 (7th Cir. 2003) (if statute "arguably covers" plaintiff's speech, "and so may deter constitutionally protected expression . . . , there is standing") (citing *Virginia v. Am. Booksellers' Ass'n, Inc.,* 484 U.S. 383, at 392–93 (1988)).

"the President."   This student "wants to speak passionately and forcefully about these issues" and wants to point out the flaws in her fellow students' arguments and encourage her fellow students to change their minds."   Speech First alleges that two more student-members have similar, and similarly concrete, plans.   These allegations and others were supported by the Neily Declaration.[7]   According to that sworn statement, "Speech First has a number of members who are current students at the University of Texas at Austin."   Further, the association's members at the University wish to engage in debates and discussions covering "a wide array of different views on matters such as politics, race, religion, gender identity, abortion, gun rights, immigration, foreign affairs, and countless other sensitive and controversial topics."   The Neily Declaration avers that students "are afraid to voice their views out of fear that their speech" may violate University policies.   For purposes of a preliminary injunction, the Declaration substantiates the allegations raised in the complaint, and Fenves suggests no grounds to doubt its veracity.[8]

It is at least likely, therefore, that Speech First's three student-members at the University have an intention to engage in a certain course of conduct,

---

[7] In this way, Speech First differs from the plaintiffs in *National Federation of the Blind of Texas, Inc. v. Abbott*, a case cited by the district court.  In that case, "the stipulated facts [were] silent" as to whether the plaintiffs intended to engage in the relevant activity. 647 F.3d 202, 209 (5th Cir. 2011).  Speech First alleges, however, with support in the record, its members' direct intention to engage in the particular activity that it alleges to be arguably regulated by the challenged provisions.

[8] Contrast that with two cases cited by the district court.   In *Mississippi State Democratic Party v. Barbour*, a political party declared an intention to hold a closed primary for the first time ever, without support in the record, without having adopted any policy or taken any vote on the matter, and without having pursued necessary preclearance from the Department of Justice to hold such a primary.  529 F.3d 538, 545 (2008).  That dubiously alleged group intention bears no resemblance to the uncontested individual intention alleged and supported here.  And in *Zimmerman v. City of Austin,* the candidate who challenged municipal campaign funding restrictions had no demonstrated intention whatsoever to accept donations exceeding the limits.  881 F.3d 378, 382 (5th Cir. 2018).

namely political speech.  Moreover, "[b]ecause [their] intended future conduct concerns political speech, it is certainly 'affected with a constitutional interest.'" *Susan B. Anthony List*, 573 U.S. at 162, 134 S. Ct. at 2344.  Speech First satisfies the first element of injury-in-fact.

## B. Arguably Proscribed

Next, Speech First must clearly show a likelihood that its members' constitutionally protected speech is arguably proscribed, or at least arguably regulated, by the University speech policies.  *See id.*; *Laird v. Tatum*, 408 U.S. 1, 11, 92 S. Ct. 2318, 2324 (1972) ("[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights."); *see also Schlissel*, 939 F.3d at 764–65.

As has been noted, Speech First members plan to engage the University community in debate encompassing a broad array of controversial political topics.  Comparably broad, however, are the categories of speech arguably covered by the University's Institutional Rule on "verbal harassment,"  the Acceptable Use Policy's requirement to be "civil" and not to send "rude" correspondence, the Residence Hall Manual proscriptions of "harassment," "intimidation," and "incivility," and the Hate and Bias Incidents policies against "bias incident[s]" and "campus climate incident[s]."  Terms like "harassment," "intimidation," "rude," "incivility," and "bias" beg for clarification.[9]  These pejoratives arguably cover the plaintiffs' intended speech.  Adding credibility to their argument, the University itself eliminated or materially altered the challenged definitions—pending appeal.  It is far-

---

[9] Similar terms have in fact been declared overbroad and vague when embedded in speech policies at other universities.  *See, e.g., Dambrot,* 55 F.3d at 1182–84.

No. 19-50529

fetched to suppose that the policies were amended in a relevant way absent any likelihood that they arguably covered Speech First's members' speech.

Undeterred, Fenves argues the policies have no bearing on the students' speech. He denies that any speech at all is "arguably proscribed" except by the Institutional Rules.[10]    Ostensibly, the other speech regulations must be precatory, not sanctionable.  In addition, he commends the policies' provisions that declare the value of free speech and argumentation.

First, even assuming that actual *proscription* is necessary, *contra Laird*, 408 U.S. at 11, 92 S. Ct. at 2324; *Schlissel*, 939 F.3d at 764–65, the Institutional Rules are not the exclusive vehicle for imposing speech penalties. The Acceptable Use Policy lists "punitive sanctions," all the way up to "criminal prosecution."  The Residential Hall Manual threatens, in addition to referral to the Dean of Students for punishment under the Institutional Rules, independent Housing sanctions for violating the Manual's rules.  Such sanctions include compelled participation in educational modules, paper-writing, and presentations, as well as room reassignment and more.  Finally, the Hate and Bias Incidents Policy provides for "Interim Measures and Final Sanctions," including suspension from campus, residence hall, or classes—or any of the sanctions authorized in the Institutional Rules.

It is uncontradicted, to be sure, that "the Dean of Students testified that '[s]tudent discipline is administered only for violations of the Institutional

---

[10] Parroting the district court, Fenves also contends that the "relevant inquiry is whether the policy actually prohibits the speech in question—not whether some might mistakenly believe it does."  This is wrong.  Under *Susan B. Anthony List,* the question is simply whether speech is "arguably . . . proscribed by" the challenged policies." 573 U.S. at 162, 134 S. Ct. at 2344; *see also Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S. Ct. 2301, 2309 (1979).  Even though a plaintiff does not intend to violate a policy, the policy's language may still be claimed to fall within the statutory regulation, e.g., of "false" statements, and the plaintiff may thus have standing.  573 U.S. at 163, 134 S. Ct. at 2344–45.

Rules.'"   Nevertheless, in light of the plain language concerning sanctions in all of the challenged policies, the Dean appears to have testified as to definition, indicating that "student discipline" is the University's name only for what follows from violations of the Institutional Rules.   In contrast, sanctions described in the Residence Hall Manual, for example, are not "student discipline" but rather "educational measure[s] implemented by the Housing Conduct Board or Residence Hall Conduct Administrator designed to affect [sic] a change in behavior and to help the student understand how their behavior impacted others in the residence hall community."   The Dean and University are entitled to their own definitions, but their nomenclature does not alter reality and does not contradict the proscriptive nature of the policies.

Nor is it tenable, as the district court found, that the CCRT "does not engage in investigations or punishment of any sort."   The implicit suggestion here is that, insofar as the Hate and Bias Incidents Policy is enforced by the CCRT, it is not sufficiently proscriptive.   This point fails under *Schlissel*.   In that case, the court "recognize[d] that [the University of Michigan's Bias Response Team] lacks any disciplinary power and that bias incidents are not directly punishable."   939 F.3d at 765.   Nevertheless, it found that "[t]he Response Team's ability to make referrals—*i.e.*, to inform [the Office of Student Conflict Resolution] or the police about reported conduct—is a real consequence that objectively chills speech."   *Id.*   So, too, when the "CCRT determines there is a possible violation of the university's [Institutional Rules] or policies outlined in the General Information Catalog, [the] CCRT refers the

incident to the appropriate entity." Under *Schlissel*, a policy thus enforced is sufficiently proscriptive to objectively chill student speech.[11]

Fenves ultimately wraps the University in the flag of its policies' paeans to the freedom of speech. According to Fenves, "the University's policies expressly protect and encourage [the speech at issue]." Without exception, he contends, the Institutional Rules, Acceptable Use Policy, and Residence Hall Manual, respectively, exclude arguments about ideas from "verbal harassment," affirm the "great value of freedom of thought and expression," and "encourage all members of [the University's] community to support the freedom of speech."

Examined more closely, however, none of these statements detracts from the likelihood that the University's policies arguably cover Speech First's members' intended speech. First, the Residence Hall Manual's "encourage[ment]" of the freedom of speech does not appear in the sections on "Harassment" and "Incivility," nor anywhere in the chapter on "Personal Responsibility and Student Conduct." Instead, it appears in a subsection of the Guidelines on "Posters," where freedom of speech is qualified by admonishments to "respect the mission and value[] . . . [of] providing all residents with a 'comfortable, friendly environment' and 'sense of community'" and to "not engage in gratuitously offensive expression." Second, the Acceptable Use Policy states that "[w]e do not punish or prevent expression that . . . violates no specific law *or university regulation*" and that "[i]n general, expressions of opinion by members of the university community that do not otherwise violate state and federal laws *or university rules* are protected as

---

[11] Accordingly, we need not consider, for example, Speech First's suggestion that the CCRT's public logging of incidents in a manner easily identifiable by members of the University community also indicates that the Hate and Bias Incidents Policy is proscriptive.

22

'free speech'" (emphasis added).  The Residence Hall Manual and Acceptable Use Policy clearly delimit the freedom of speech by their prohibitions, not the other way around.

The Institutional Rules, on the other hand, explicitly exclude from "verbal harassment" the "mak[ing] [of] an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea."  Fenves suggests that this phrase "straightforwardly conveys that the exclusion applies to speech that conveys the substance of an idea" and is qualified only to discourage expression extraneous to the idea itself.  We disagree.  Stated more precisely, the definition is this:  "verbal harassment" includes "hostile or offensive" speech that "is not necessary to the expression of any idea [defined as "an argument for or against the substance of any political . . . idea]."[12]  Interpreted grammatically, the exclusion applies only to speech that conveys the substance of an idea *and is necessary to such conveyance*.  Such a qualified limitation on the scope of the term "verbal harassment" increases rather than decreases its uncertainty.

In sum, while purporting to invoke free speech, the Institutional Rules qualify protected speech and fail to cabin the terms "harassment,"

---

[12] Section 13–204(b)(1) and (2) state in full:

1. "Verbal harassment" means hostile or offensive speech, oral, written, or symbolic, that
    A. is not necessary to the expression of any idea described in subsection 13–204(b)(2);
    B. is sufficiently severe, pervasive, or persistent to create an objectively hostile environment that interferes with or diminishes the victim's ability to participate in or benefit from the services,
    activities, or privileges provided by the University; and
    C. personally describes or is personally directed to one or more specific individuals.
2. To make an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea is not verbal harassment, even if some listeners are offended by the argument or idea. The categories of sexually harassing speech set forth in Policy 3-3031 of the Handbook of Operating Procedures are rarely, if ever, necessary to argue for or against the substance of any political, religious, philosophical, ideological, or academic idea.

"intimidation," "rude[eness]," "incivility," and "bias."  It is likely that the University's policies arguably proscribe speech of the sort that Speech First's members intend to make.

## C.  Substantial Threat of Future Enforcement

The last element of injury in fact, in this context, is whether it is clearly likely that "the future threat of enforcement of the [challenged policy] is substantial." *Susan B. Anthony List*, 573 U.S. at 164, 134 S. Ct. at 2345.  At this point, "[t]he distinction between facial and as-applied challenges bears legal significance." *See Schlissel*, 939 F.3d at 766.  Whereas "[t]here must be some evidence that [a] rule would be applied to the plaintiff in order for that plaintiff to bring an as-applied challenge," that is not the case for facial challenges.  *Id.*; *accord Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006); *see also Google Inc. v. Hood*, 822 F.3d 212, 227–28 (5th Cir. 2016) (involving no facial challenge).  Instead, "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996); *accord Carmouche*, 449 F.3d at 660; *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 237–39 (3d Cir. 2010) (determining standing based on policies alone); *Ariz. Right to Life PAC v. Bayless,* 320 F.3d 1002, 1006–07 (9th Cir. 2003); *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003); *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999).

The University of Texas members of Speech First plainly belong to a class arguably facially restricted by the University policies.  Not only this, Speech First has also shown, by producing the University's public log of bias incidents, that the Hate and Bias Incidents Policy has been resorted to

countless times regarding hundreds of events since 2012.  Significantly, the largest numbers of reported complaints have related to Israel and affirmative action, two topics on which Speech First member Student A, for example, intends to speak.  Such evidence establishes a threat of enforcement, not only of the Hate and Bias Incidents Policy, but also of the University's other intertwined policies.  The Hate and Bias Incidents Policy, after all, specifically refers to the Institutional Rules, as do the CCRT webpage and the Residence Hall Manual regarding the same issues.  In addition, the Institutional Rules on speech specifically refer to the Acceptable Use Policy for "[r]ules protecting and regulating speech on University computer networks."  These overlapping policies strongly suggest that enforcement of one produces a credible threat of enforcement of the others.  Speech First has clearly shown a credible threat of enforcement of those policies upon its members.

Fenves disagrees with the sufficiency of this showing based on case law and on "compelling contrary evidence" that belies a credible threat of prosecution.  The district court focused on the proffered declarations of University officials that no sanctions had been imposed for violating the challenged policies.

On the case law, Fenves notes, *Laird* holds that "a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity" faces no substantial threat of future harm.  408 U.S. at 10, 14, 92 S. Ct. at 2324.  This holding was necessitated by the facts of the case.  But *Laird* also contrasted the facts before it with a number of cases where "this Court has found . . . that constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights."  *Id.*

25

No. 19-50529

(citations omitted). Standing existed in the Court's prior cases because "the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions he was challenging." *Id.* at 11, 2325. Thus, according to *Laird*, a plaintiff who belongs in a class subject to the challenged policies has standing, while one who only resides in a country that maintains policies with which he disagrees, but who fails to allege himself personally subject to the policies, does not. *Id.* at 13, 2326. *Laird* does not prevent these plaintiffs, who are arguably covered by the allegedly unconstitutional policies, from having standing.

In a second thrust at Speech First's invocation of *Gardner*, Fenves quotes *Carmouche*, in which this court required more than "the mere existence of an allegedly vague or overbroad statute." 449 F.3d at 660. This is in harmony with *Laird*. That *Carmouche* relied on a history of past enforcement to show a substantial threat of future enforcement does not contradict *Laird*'s acknowledgement that a plaintiff who is subject to a regulation or proscription has standing to sue. Either type of evidence may establish "a fear of prosecution that is not 'imaginary or wholly speculative.'" *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 302, 99 S. Ct. 2301, 2311 (1979)). As the Seventh Circuit explained, a plaintiff who mounts a pre-enforcement statutory challenge on First Amendment grounds "need not show that the authorities have threatened to prosecute him . . . ; the threat is latent in the existence of the statute." *Majors,* 317 F.3d at 721.

Finally, *Clapper v. Amnesty International USA* imposes no obstacle to finding a threat in this case that is likely substantial. In *Clapper*, the Supreme Court determined that the plaintiffs were in a class that, under the challenged statute, could not be targeted. 568 U.S. 398, 411, 133 S. Ct. 1138, 1148 (2013). Having established this, the Court looked for a history of enforcement or

26

specific facts[13] about the government's targeting practices that might yet give rise to a substantial threat of enforcement. *Id.* The Court did not suggest, however, that if the plaintiffs had been the subject of the challenged policies, such evidence would have been necessary. Unsurprisingly, in *Blum v. Holder*, the First Circuit determined that "*Clapper* does not call into question the assumption that the state will enforce its own non-moribund criminal laws, absent evidence to the contrary." 744 F.3d 790, 798 n.11 (1st Cir. 2014) (citing *Gardner*, 99 F.3d at 15). The standard articulated in *Gardner* remains sound.

Turning to the argument that the University offered "compelling contrary evidence" to the presumption of enforcement, Fenves alleges an absence of relevant past enforcement of the University's policies. He reiterates the speech-protecting language of the policies in question and points to declarations by University officials to support that the University lacks any intention to penalize the intended conduct of Speech First's members.

This evidence is not compelling. First, both Fenves and a former Dean of Students assert that they know of no instance in which the University speech policies have been enforced against the speech topics described by Speech First.[14] Past enforcement of speech-related policies can assure standing, but as the foregoing discussion shows, a lack of past enforcement does not alone doom a claim of standing. *See, e.g., Carmouche,* 449 F.3d at 660 ("Controlling precedent . . . establishes that a chilling of speech because of the mere existence of an allegedly vague or overbroad [law] can be sufficient injury

---

[13] Unlike this case, *Clapper* reviewed dismissal for lack of standing at the summary judgment stage, at which a plaintiff "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'" *Id.* at 412, 1148–49.

[14] There is no reason to doubt their statements, which are based only on their personal experience; but on the other hand, the University's student disciplinary records were unavailable to Speech First at this stage of litigation.

to support standing."). Where the policy remains non-moribund, the claim is that the policy causes self-censorship among those who are subject to it, and the students' speech is arguably regulated by the policy, there is standing. *See, e.g., Schlissel,* 939 F.3d at 766 (fact that "there is no evidence in the record" of past enforcement "misses the point"). Second, as was discussed above, the policies' protection for student free speech "rights" is qualified and limited by required adherence to "university rules." And third, University officials' disavowals of any future intention to enforce the policies contrary to the First Amendment are compatible with, and simply reinforce, the open-ended language in those policies. The difficulty with such disavowals is that regulations governing "rude," "uncivil," "harassing," or "offensive" speech can in fact cover speech otherwise protected by the First Amendment. *See Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207 (2011); *Vill. of Skokie v. Nat'l Socialist Party of Am.*, 373 N.E.2d 21, 23 (Ill. 1978).[15] Moreover, the University continues to defend the use of these terms.

Even more to the point, if there is no history of inappropriate or unconstitutional past enforcement, and no intention to pursue discipline against students under these policies for speech that is protected by the First Amendment, then why maintain the policies at all? At least, why maintain the plethora of potential sanctions? After all, the University regulatory policy for speech, including the Acceptable Use Policy, could have stated succinctly that students will be disciplined, up to and including academic punishment

---

[15] This difficulty is not avoided by the University's reliance on *Blum*. The *Blum* court construed a federal statute and, in doing so, exercised special "rigor[ ]" due to separation of powers concerns. 744 F.3d at 797. The statute in that case specifically targeted conduct, violent threats, and economic damage, but specifically excluded criminal liability for protected First Amendment conduct. 744 F.3d at 794. The government's disavowal of prosecutions for protected speech thus had a secure statutory basis, unlike the disavowals here.

and criminal referral, for speech that is outside the protection of the First Amendment and, perhaps, Title IX, which covers sexual harassment in institutions receiving federal funds.[16] A reasonable observer must deduce that the University meant to expand its regulatory authority beyond the First Amendment; consequently, a reasonable student must act on the same assumption and self-censor her speech in accord with the perceived policies.

Adding to the credible threat that the policies pose to the exercise of protected speech are two other circumstances: the University's awareness that verbal harassment policies must be applied "narrowly" and the operation of the Hate and Bias Incidents Policy, through the CCRT, to deter those who would express controversial views.

The Institutional Rules' definition of verbal harassment consumes nearly a full page of small type. This alone might raise questions about vagueness, but the uncertainty is magnified by the University's caveat that:

> Verbal harassment has been interpreted very narrowly by the federal courts. Policies on verbal harassment or hate speech at many universities have been held unconstitutional . . . . This policy should be interpreted as narrowly as need be to preserve its constitutionality.

Put in terms of prospective enforcement, what does this mean? Surely it reasonably implies that the University will protect and enforce its verbal harassment policy as far as possible, but the distance to that horizon is unknown by the University and unknowable to those regulated by it.

Likewise, insofar as the CCRT's evaluations of bias incident reports is based on the same definition of verbal harassment, the entire University community has been encouraged to and has funneled into the CCRT hundreds

---

[16] *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 119 S. Ct. 1661 (1999). Whether *Davis* may constitutionally support purely verbal harassment claims, much less speech-related proscriptions outside Title IX protected categories has not been decided by the Supreme Court or this court and seems self-evidently dubious.

of wide-ranging complaints.  Moreover, the CCRT has "referred" a large number of reporting individuals "to appropriate sources of support and/or coordinate[d] with a university entity as appropriate."  The CCRT describes its work, judgmentally, in terms of "targets" and "initiators" of incidents.  Further, examples of CCRT responses to reported incidents have included "facilitating conversation between those who were targeted by and those who initiated an incident; and making referrals to campus resources such as the UT Austin Police Department, the Office of the Dean of Students, and the Office for Inclusion and Equity (OIE)."  The CCRT, in some measure, represents the clenched fist in the velvet glove of student speech regulation.

That the CCRT invites anonymous reports carries particular overtones of intimidation to students whose views are "outside the mainstream."  As one expert explains, "[i]n both concept and design, such efforts [by "bias response teams"] to encourage students to anonymously initiate disciplinary proceedings for perceived acts of bias or to shelter themselves from disagreeable ideas are likely to subvert free and open inquiry and invite fears of political favoritism."  Keith Whittington, *Free Speech and the Diverse University*, 87 Fordham L. Rev. 2453, 2466 (2019); *see also* Hon. Jose Cabranes, *For Freedom of Expression, For Due Process, and For Yale: The Emerging Threat to Academic Freedom at a Great University*, 35 Yale L. & Pol. Rev. 345, 360 (2017) (lamenting potential dangers of anonymous reports and recordkeeping by campus bias "police").

For these reasons, the existence of the University's policies, which the University plans to maintain as far as a federal court will allow it, suffices to establish that the threat of future enforcement, against those in a class whose speech is arguably restricted, is likely substantial.  And such likelihood is all that is necessary to establish the final prong of injury-in-fact for standing to

No. 19-50529

seek a preliminary injunction in this kind of case.  Speech First has established an injury in fact.

## D.  Causation and Redressability

As in *Carmouche*, "[t]he causation and redressability prongs of the standing inquiry are easily satisfied here."  449 F.3d at 661.  After all, "[p]otential enforcement of the [challenged policies] caused [Speech First's members'] self-censorship, and the injury could be redressed by enjoining enforcement of [those policies]." *Id.*  Accordingly, Speech First has standing to seek a preliminary injunction.

## III. Remaining Factors

On the record before us, the case is not moot, and the plaintiff has standing to seek a preliminary injunction.  For purposes of a preliminary injunction, the next step would be to consider whether Speech First is likely to succeed on the merits.  Because the district court did not move to the merits, though, and because the new language Fenves proposes might yet be adopted by formal procedures of the Board of Regents and might—or might not—moot certain issues, we must remand to the district court for reassessment of the preliminary injunction.

At the same time, we note the consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague.[17]

---

[17] *See, e.g.*, *McCauley*, 618 F.3d 232; *DeJohn*, 537 F.3d 301; *Dambrot*, 55 F.3d 1177; *Shaw v. Burke*, No. 2:17-cv-02386, 2018 U.S. Dist. LEXIS 7584 (C.D. Cal. Jan. 17, 2018); *Univ. of Cinc. Chapter of Young Ams. for Liberty v. Williams*, No. 1:12-cv-155, 2012 U.S. Dist. LEXIS 80967 (S.D. Ohio June 12, 2012); *Smith v. Tarrant Cty. Coll. Dist.*, 694 F. Supp. 2d 610 (N.D. Tex. 2010); *Coll. Repub's at S.F. State Univ. v. Reed,* 523 F. Supp. 2d 1005 (N.D. Cal. 2007); *Pro-Life Cougars v. Univ. of Houston*, 259 F. Supp. 2d 575 (S.D. Tex. 2003); *UWM Post, Inc. v. Bd. of Regents of Univ. of Wis. Sys.*, 774 F. Supp. 1163 (E.D. Wis. 1991); *Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989).

No. 19-50529

Of course, not every utterance is worth protecting[18] under the First Amendment. In our current national condition, however, in which "institutional leaders, in a spirit of panicked damage control, are delivering hasty and disproportionate punishment instead of considered reforms,"[19] courts must be especially vigilant against assaults on speech in the Constitution's care. Otherwise, the people may not "be free to generate, debate, and discuss both general and specific ideas, hopes, and experiences," to "transmit their resulting views and conclusions to their elected representatives," "to influence the public policy enacted by elected representatives,"[20] and thereby to realize the political and human common good.[21]

## CONCLUSION

The judgment of the district court is **VACATED**, and we **REMAND** the case to proceed in light of this decision.

---

[18] *See generally* John Finnis, *Reason in Action: Collected Essays Volume I* 277–324 (2011); Harvey C. Mansfield, *The Value of Free Speech*, 37 National Affairs 164 (2018).

[19] Elliot Ackerman et al., *A Letter on Justice and Open Debate*, Harper's Magazine, July 7, 2020, https://harpers.org/a-letter-on-justice-and-open-debate/; *cf.* Marie-Rose Sheinerman, *Eisgruber condemns professor's op-ed that called Black Justice League a 'terrorist organization'*, The Daily Princetonian, July 12, 2020, https://www.dailyprincetonian.com/article/2020/07/joshua-katz-black-justice-league-terrorist-organization-quillette-letter-princeton.

[20] *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2358 (2020) (Breyer, J., concurring in part).

[21] *See generally* Robert P. George, *Making Men Moral* 192–210 (1993).