# SUPREME COURT OF THE UNITED STATES

### SPEECH FIRST, INC. *v.* PAMELA WHITTEN, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 24–361.   Decided March 3, 2025

The petition for a writ of certiorari is denied. JUSTICE ALITO would grant the petition for a writ of certiorari.

JUSTICE THOMAS, dissenting from the denial of certiorari.

More than 450 of our Nation's colleges and universities have "bias response teams." These teams "encourag[e] students to report one another for expressions of 'bias,'" and then review and act upon reports. *Speech First, Inc.* v. *Sands*, 601 U. S. \_\_\_, \_\_\_–\_\_\_ (2024) (THOMAS, J., dissenting) (slip op., at 1–2). In reviewing First Amendment challenges to bias response teams, the Courts of Appeals have split as to whether they "objectively chill" student speech for purposes of Article III standing. I would grant certiorari to resolve that important split.

I

Indiana University (IU) operates a bias response team that is emblematic of the genre. IU's team has advertised on its websites and on social media that students should report "'bias incidents'" to the school. 2024 WL 3964864, *1 (SD Ind., Aug. 28, 2024). Students can file such reports by anonymously completing an online form, emailing or calling a school administrator, or using an IU-run cellphone application.

IU loosely defines the term "bias incidents" to "include 'any conduct, speech, or expression, motivated in whole or in part by bias or prejudice meant to intimidate, demean, mock, degrade, marginalize, or threaten individuals or groups based on that individual or group's actual or per-

ceived identities.'" *Ibid.* "Unsurprisingly, such an expansive policy has prompted students to report any and all perceived slights." *Sands*, 601 U. S., at ___ (THOMAS, J., dissenting) (slip op., at 4). For example, one complainant (who was not Asian) objected to comments expressing dislike for "'China'" or "'Chinese things'" made in the presence of two Asian students, while another reported a Facebook post featuring a picture of a sticker reading "'Diversity Divides Nations.'" Record in No. 1:24–cv–898 (SD Ind.), Doc. 9–30, p. 3.

When a student files a report, IU's team reviews the submission, and has a variety of options at its disposal. For example, it may invite a student reported for an allegedly offensive comment to attend a meeting to discuss his behavior, or it may refer the impacted student to support services. And, while the bias response team cannot itself discipline students or "[c]onduct formal investigations," it does assess whether there have been "potential violations of university policy and/or criminal law." 2024 WL 3964864, *1 (internal quotation marks omitted). If a potential violation exists, then the team can refer the matter to other campus offices with disciplinary power. The team also logs all reports in a database, which it tracks for trends.

Speech First, a national membership organization that "seeks to protect free speech rights on college campuses," sued to enjoin IU from enforcing this "bias incidents" policy. *Id.*, at *1–*2. Speech First's members include five IU students who hold political "views that are unpopular . . . on campus," including on issues such as "gender identity, immigration, affirmative action, and the Israel-Palestine conflict." *Id.,* at *2 (internal quotation marks omitted). But, the students self-censor their discussion of these views out of fear that "others will likely report [them] to University officials for committing a bias incident." *Ibid.* (internal quotation marks omitted). This petition arises from Speech First's unsuccessful motion to preliminarily enjoin IU from

"'enforcing [its bias-incident] policies during th[e] litigation.'" *Ibid.*

As the parties recognized below, Speech First's motion was doomed under binding Circuit precedent. The Seventh Circuit had previously dismissed a similar Speech First suit against the University of Illinois at Urbana-Champaign for lack of Article III standing. See *Speech First, Inc.* v. *Killeen*, 968 F. 3d 628 (2020). In *Killeen*, the court held that Speech First had failed to satisfy either of two avenues for establishing standing: It had neither "demonstrated that [Illinois's bias response] policies pose a credible threat of enforcement to any student" nor shown that "any student has faced an objectively reasonable chilling effect on his or her speech." *Id.*, at 639. The Seventh Circuit pointed to features of the Illinois program that limited its reach: Among other things, meetings with the bias response team were technically optional, and the team could not itself sanction students. *Id.*, at 639–644. Accordingly, it concluded, Speech First lacked an injury-in-fact sufficient to confer Article III standing. *Id.*, at 643–644.

The District Court agreed that *Killeen* was controlling and denied the motion for a preliminary injunction. Given the IU program's similar design, the District Court explained, "*Killeen* cannot be meaningfully distinguished." 2024 WL 3964864, *3. The Seventh Circuit summarily affirmed. 2024 WL 4363740, *1 (Sept. 5, 2024). Speech First then sought certiorari.

## II

This case presents an opportunity to resolve an important Circuit split. Three Circuits, when evaluating similar facts, have rejected the Seventh Circuit's view and found that bias response policies "objectively chill" student speech. *Speech First, Inc.* v. *Cartwright*, 32 F. 4th 1110, 1122–1124 (CA11 2022); *Speech First, Inc.* v. *Fenves*, 979 F. 3d 319, 333, 338 (CA5 2020); *Speech First, Inc.* v. *Schlissel*, 939

F. 3d 756, 765 (CA6 2019).  If this case had proceeded in those Circuits, then Speech First likely would have been able to establish Article III standing.  For example, the Sixth Circuit has recognized that a bias response team's "ability to make referrals . . . is a real consequence that objectively chills speech," and that this "lurk[ing]" referral power causes even optional meeting invitations to "carry an implicit threat of consequence should a student decline the invitation." *Ibid.*  It makes no difference, on the Sixth Circuit's view, if the bias response team itself "lacks any formal disciplinary power." *Ibid.*

Previously, the Fourth Circuit joined in the Seventh Circuit's contrary position. *Speech First, Inc.* v. *Sands*, 69 F. 4th 184, 193–197 (2023).  But, based on a mid-litigation change in university policy, this Court granted the *Sands* petition, vacated the judgment below, and remanded with instructions for the Fourth Circuit to dismiss the suit as moot.  See 601 U. S., at ___ (slip op., at 1) (citing *United States* v. *Munsingwear, Inc.*, 340 U. S. 36 (1950)).  The Seventh Circuit therefore stands alone.

I would grant Speech First's petition and resolve the split.  As this Court implicitly recognized when it chose to intervene in *Sands*, the split poses an important First Amendment question.  I continue to believe that we should clarify the scope of a student's right to challenge university policies that "potentially pressur[e him] to avoid controversial speech." *Sands*, 601 U. S., at ___ (THOMAS, J., dissenting) (slip op., at 6).

The Seventh Circuit's approach is also very likely wrong. It is well settled that plaintiffs may establish standing based on "the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird* v. *Tatum*, 408 U. S. 1, 11 (1972).  And, in assessing whether an "objective chill" exists in a particular case, see *Clapper* v. *Amnesty Int'l USA,* 568 U. S. 398, 418 (2013), courts must "look

through forms to the substance" of the government's "informal sanctions," *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58, 67 (1963). The Seventh Circuit's emphasis on the formal limits of a bias response team's power seems hard to square with this Court's framework. See *Killeen*, 968 F. 3d, at 640–643.

Common features of bias response policies suggest that they may cause "'students [to] self-censor, fearing the consequences of a report to [the bias response team] and thinking that speech is no longer worth the trouble.'" *Sands*, 601 U. S., at \_\_\_ (THOMAS, J., dissenting) (slip op., at 6) (quoting *Sands*, 69 F. 4th, at 204 (Wilkinson, J., dissenting)). At IU as elsewhere, the bias response program combines a definition of bias that "appears limitless in scope" with a "threshold for reporting [that] is intentionally low." *Sands*, 601 U. S., at \_\_\_ (THOMAS, J., dissenting) (slip op., at 4). Compounding the problem, the option of anonymous reporting makes filing a report socially costless. *Ibid.* And, the threat that the bias response team may refer a report to other university officers for further action is a "weighty consequenc[e]" that "'lurks in the background.'" *Id.*, at \_\_\_ (slip op., at 5) (quoting *Schlissel*, 939 F. 3d, at 765).

Finally, this case does not present any complicating features that would hamper review. Because IU's bias response team remains fully in place, this case does not raise the mootness question that led the Court to avoid granting plenary review in *Sands*. See Indiana University, Bias Incident Reporting (Feb. 28, 2025), https://reportincident.iu.edu/one-page/index.html. There is no reason for this Court to deny certiorari.*

––––––––––

\*I continue to believe that a university's mid-litigation alteration of a bias response policy does not generally moot a challenge to that policy and that we should have resolved the standing question in *Sands*. See 601 U. S., at \_\_\_, n. 2 (THOMAS, J., dissenting) (slip op., at 2, n. 2). I also continue to believe that, in an appropriate case, this Court should revisit whether "associational standing can be squared with Article III's" limits.

THOMAS, J., dissenting

\*　　\*　　\*

Given the number of schools with bias response teams, this Court eventually will need to resolve the split over a student's right to challenge such programs.  The Court's refusal to intervene now leaves students subject to a "patchwork of First Amendment rights," with a student's ability to challenge his university's bias response policies varying depending on accidents of geography.  *Sands*, 601 U. S., at ___ (THOMAS, J., dissenting) (slip op., at 6).  Because one of our "primary functions is to resolve 'important matter[s]' on which the courts of appeals are 'in conflict,'" we should not let this confusion persist.  *Gee* v. *Planned Parenthood of Gulf Coast, Inc.*, 586 U. S. 1057 (2018) (THOMAS, J., dissenting from denial of certiorari) (quoting this Court's Rule 10(a)).  I respectfully dissent.

---

*FDA* v. *Alliance for Hippocratic Medicine*, 602 U. S. 367, 405 (2024) (THOMAS, J., concurring).  But, under our precedents, an association such as Speech First can establish standing to sue on behalf of its members.