# SUPREME COURT OF THE UNITED STATES

SPEECH FIRST, INC. *v.* TIMOTHY SANDS,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE UNIVERSITY OF
VIRGINIA POLYTECHNIC INSTITUTE
AND STATE UNIVERSITY

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 23–156.   Decided March 4, 2024

The petition for a writ of certiorari is granted. The judgment with respect to the Bias Policy claims is vacated, and the case is remanded to the United States Court of Appeals for the Fourth Circuit with instructions to dismiss those claims as moot. See *United States* v. *Munsingwear*, *Inc.*, 340 U. S. 36 (1950). JUSTICE JACKSON, dissenting: I would deny the petition. In my view, the party seeking vacatur has not established equitable entitlement to that remedy. See *Acheson Hotels*, *LLC* v. *Laufer*, 601 U. S. \_\_\_ (2023) (JACKSON, J., concurring in the judgment).

JUSTICE THOMAS, with whom JUSTICE ALITO joins, dissenting.

Speech First, a national membership organization seeking to protect free speech on college campuses, brought suit against Virginia Tech to enjoin the university's "bias intervention and response team policy." Under that policy, Virginia Tech encourages students to report one another for expressions of "bias"—defined as any "expressio[n] against a person or group because of" an enumerated list of characteristics. App. in No. 21–2061 (CA4), p. 140. Students are instructed to "[r]eview" their "language, images, and other forms of communication to make sure all groups are fairly represented." *Id.*, at 144. A "bias intervention and re-

sponse team" made up of university officials then investi-gates reports, with the option to refer students for discipline or to the police. Speech First argues that this policy amounts to "a literal speech police." Pet. for Cert. i. It con-tends that the policy violates the First Amendment by chilling its student-members' speech, causing students to stay silent on controversial or unpopular issues for fear of being reported to the university. The Court of Appeals for the Fourth Circuit held that Speech First lacked standing to bring this claim because the university's policy does not objectively chill students' speech. 69 F. 4th 184, 197 (2023).[1] It acknowledged that this conclusion diverged from that of three other Courts of Appeals. *Id.*, at 197–198.

Speech First asks us to review whether Virginia Tech's bias response policy objectively chills students' speech.[2] I would grant the petition. It raises an important question affecting universities nationwide; Speech First estimates that over 450 universities have similar bias-reporting schemes. Pet. for Cert. 7. Yet, because of the split among

---

[1] To establish organizational standing under our precedent, Speech First must first show that one of its student-members has suffered an injury. See *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 199 (2023). The Courts of Appeals have reasoned that Speech First's students suffered an injury sufficient to confer standing if it could show the bias response policies chilled stu-dents' speech.

[2] Shortly before Speech First petitioned for certiorari, Virginia Tech changed its policy. Other universities have attempted a similar maneu-ver, but two Courts of Appeals have found that these policy changes did not moot Speech First's challenges. See *Speech First, Inc.* v. *Fenves*, 979 F. 3d 319, 328 (CA5 2020) ("This is not the first appeal in which a public university has had a sudden change of heart, during litigation, about the overbreadth and vagueness of its speech code, and then advocated moot-ness"); see also *Speech First, Inc.* v. *Schlissel*, 939 F. 3d 756, 769–770 (CA6 2019). Of course, a defendant's voluntary cessation of its chal-lenged conduct does not always moot a case. See *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 189 (2000). I thus refer to Virginia Tech's policy in the present tense.

the Courts of Appeals, many of these universities face no constitutional scrutiny, simply based on geography. I have serious concerns that bias response policies, such as Virginia Tech's, objectively chill students' speech.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." "[S]tate colleges and universities," including Virginia Tech, "are not enclaves immune from the sweep of the First Amendment." *Papish* v. *Board of Curators of Univ. of Mo.*, 410 U. S. 667, 670 (1973) (*per curiam*) (internal quotation marks omitted). Although the First Amendment applies most straightforwardly to government regulations that directly restrict speech, this Court has recognized that "constitutional violations [can also] arise from the deterrent, or 'chilling,' effect of governmental regulations." *Laird* v. *Tatum*, 408 U. S. 1, 11 (1972). After all, "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" may cause self-censorship in violation of the First Amendment just as acutely as a direct bar on speech. *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58, 67 (1963).

In applying these principles, the Courts of Appeals have divided over whether bias response policies have a "chilling effect" on students' speech. Compare *Speech First, Inc.* v. *Cartwright*, 32 F. 4th 1110, 1124 (CA11 2022); *Speech First, Inc.* v. *Fenves*, 979 F. 3d 319, 338 (CA5 2020); and *Speech First, Inc.* v. *Schlissel*, 939 F. 3d 756, 765 (CA6 2019); with 69 F. 4th, at 197; and *Speech First, Inc.* v. *Killeen*, 968 F. 3d 628, 644 (CA7 2020). In this case, the Fourth Circuit held that Virginia Tech's bias response policy does not chill students' speech because the bias response team lacks authority to discipline or otherwise punish students and the implementation of the policy is not so heavyhanded that it deters students' speech. 69 F. 4th, at 196–197.

I am skeptical of the Fourth Circuit's conclusion. The scope of Virginia Tech's policy combined with how it is enforced suggests that the university is stifling students'

speech, at least enough to provide Speech First standing to pursue its First Amendment claim. First, the university's bias response policy appears limitless in scope. According to Virginia Tech, "bias incidents" are "expressions against a person or group" based on "age, color, disability, gender, gender identity, gender expression, genetic information, national origin, political affiliation, race, religion, sexual orientation, veteran status, or any other basis protected by law." App. in No. 21–2061 (CA4), at 140. The university provided examples of bias incidents, such as "words or actions that contradict the spirit of the Principles of Community" and "jokes that are demeaning to a particular group of people." *Ibid.* Unsurprisingly, such an expansive policy has prompted students to report any and all perceived slights. For example, one report was submitted when "a student in a University residence hall overheard several male students privately talking crap about the women who were playing in a snowball fight, calling them not 'athletic.'" *Speech First, Inc.* v. *Sands*, 2021 WL 4315459, \*10 (WD Va., Sept. 22, 2021) (some internal quotation marks and alteration omitted). Another person submitted a report after someone "observed the words Saudi Arabia on the white board of [a] room"—despite acknowledging that "[i]t was unclear what the motive or complete message of the text originally was." Decl. of C. Norris in No. 7:21–cv–00203 (WD Va., Apr. 12, 2021), ECF Doc. 4–2, p. 123. Other universities with bias response policies have received similar reports. See, *e.g.*, App. in No. 21–2061 (CA4), at 254 (explaining that Ohio State University received a report for "a chalk message stating 'Build the Wall'"); *id.*, at 252 (highlighting that Texas Tech University received a report for a student group tweeting "'All lives don't matter . . . #BlackLivesMatter'").

Second, the threshold for reporting is intentionally low. The policy permits anonymous reporting, meaning there is little to no social cost for accusing a classmate of bias. And,

students are encouraged to report other students for anything that even hints of "bias." Indeed, the university ran a campaign: "[I]f you hear or see something that feels like a bias incident, statement, or expression, we encourage you to make a report. In short, if you see something, say something!" *Id.*, at 200. The policy does not limit the ability to report to fellow students—anyone in the "university community" may report Virginia Tech students for bias incidents. *Id.*, at 141. Reports may also cover incidents that take place outside the university, including off campus or on social media. Thus, the policy follows Virginia Tech students wherever they go. From the moment a student enters the university until graduation, he is under the university's surveillance.

Third, a report can have weighty consequences. After a report is filed, it goes to the bias response team. The team includes university officials from the Office of the Dean of Students, Office for Equity and Accessibility, Office for Inclusion and Diversity, Student Conduct, and the Virginia Tech Police Department. The university officials may call in the accused student—whom the policy pre-emptively labels as the "perpetrator"—for a meeting. The team may require "[i]nterventions of either an educational or restorative nature." *Id.*, at 372. The team even possesses the authority to refer a student for formal discipline or to the police. And, of course, every report—regardless of whether the team determines bias exists—is recorded and kept on permanent file by the university. See *ibid.*; see also 69 F. 4th, at 212 (Wilkinson, J., dissenting). Thus, even if the "perpetrator" is not technically required to accept the team's invitation to meet, it is hard to believe a college student could so easily ignore a university official's request, especially when the report will be filed and "the referral power lurks in the background of the invitation." *Schlissel*, 939 F. 3d, at 765.

Considering the scope and enforcement of the university's

policy, it is at least a close question whether "students [may] self-censor, fearing the consequences of a report to [the bias response team] and thinking that speech is no longer worth the trouble." 69 F. 4th, at 204 (Wilkinson, J., dissenting). This seems particularly true regarding controversial issues where dissenting opinions might be deemed biased.

This petition presents a high-stakes issue for our Nation's system of higher education. Until we resolve it, there will be a patchwork of First Amendment rights on college campuses: Students in part of the country may pursue challenges to their universities' policies, while students in other parts have no recourse and are potentially pressured to avoid controversial speech to escape their universities' scrutiny and condemnation. We should grant certiorari to resolve this issue.